# CHARLESTON.

## MARTIN et al. v. THAYER et al.

Submitted June 21, 1892.—Decided November 19, 1892.

1. NEW TRIAL—WEIGHT OF EVIDENCE.

The court may grant a new trial when the evidence is conflicting and the verdict is against the weight of evidence; but in such a case the power of the court to grant a new trial should be cautiously exercised; and when in such a case the court grants a new trial, its opinion is entitled to peculiar respect, and the appellate court will not reverse such order unless it is plainly wrong. *Reynolds* v. *Thompkins*, 23 W. Va. 229.

2. WILLS—MENTAL CAPACITY.

Upon the trial of an issue *devisavit vel non*, where want of mental capacity is relied on as one of the grounds for invalidating a will, the vital question is as to the testator's mental condition at the time the instrument purports to have been executed.

3. WILLS—MENTAL CAPACITY.

Where a testator has the legal capacity to make a will, he has the legal right to make an unequal, unjust, or unreasonable will. "*Voluntas stat pro ratione.*" *Couch* v. *Eastham*, 3 S. E. Rep. 23 (29 W. Va. 784.)

4. WILLS—MENTAL CAPACITY.

The capacity to make a will is sufficient if the testator understands the nature of the business in which he is engaged, has a recollection of the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them.

5. WILLS—MENTAL CAPACITY.

Although a testator, in making his will, is prompted by a mistaken apprehension of fact to make an alteration in his will; and exclude thereby a grandchild from participating in his bounty, such mistake will not invalidate the will, if made by a competent testator, and legal in other respects.

*B. M. Ambler* and *J. W. Vandervort* for appellants:

I.—*This appeal lies from an order setting aside a verdict, without awaiting a new trial.*—Code, c. 145, s. 1, ¶.9 ; 32 W. Va. 487.

II.—*An order awarding a new trial will be reversed, unless it appears that the verdict was plainly not warranted.*—32 W. Va. 487 ; 26 W. Va. 338.

III.— *The Verdict is warranted by the evidence.*

    (1.) The burden is on contestees.—20 W. Va. 259 ; 31 W. Va. 659 ; 85 Va. 546 ; 47 Barb. 232 ; 25 N. Y. 34–5 ; 21 W. Va. 63.

    (2.) If evidence leaves doubt, the verdict must be against the will.—20 W. Va. 264–5.

    (3.) West Virginia jealously guards the province of the jury.—14 S. E. Rep. 12 ; 14 S. E. Rep. 465.

    (4.) On this issue, jury are probate judges.—21 W. Va. 45 ; 1 Gratt. 82. Hence their findings on capacity are generally final.—27 N. E. Rep. 958.

    (5.) The disease peculiarly affected the brain.—1 Tid. Leg. Med. 247.

    (6.) The signature showed incapacity.—17 W. Va. 684, 706.

    (7.) The will was unjust.—Redf. Will Cas. 451 *etc.* ; 2 W. & T., L. C. 1281.

    (8.) It was irrational in itself.—85 Va. 546.

    (9.) It was made under delusion or false suggestion.—25 Cent. Law. J., 197 ; 35 N. Y. ; 27 N. E. Rep. 975 ; 1 Jar. Wills 44, 77, 100, 114.

    (10.) The testator was prompted.—1 Bar. Ch'y Pr. 569 ; Redf. Wills 96 ; Redf. Cas. 171.

    (11.) The will contradicted his life's record and former papers and violated his promise.—21 W. Va., 61 ; 2 W. & T. L. C. 1281–5 ; 27 Gratt. 96 ; 17 W. Va. 23 pt. Syl.

    (12.) The testator's sudden change of character and purpose showed incapacity or imposition.—65 Pa. St. 347 ; 63 N. Y. 213 ; 82 Va. 225 ; 21 Am. St. R. 21 ; 15 Wall. 580.

    (13.) Undue influence may be inferred from facts proven.—17 W. Va. 702–3 ; 4 W. Va. 729 ; 21 W. Va. 62.

    (14.) The attending physician showed testator's incapacity.—31 W. Va. 660.

*J. B. Jackson* and *J. A. Hutchinson* for appellees cited 29 Gratt. 66 ; 21 W. Va. 46 ; Code (1890) 13, s. 15 ; 31 W. Va. 431 ; 2 Gratt. 18, 23 ; 12 W. Va. 116, 125 ; 3 Munf. 51 ; 24

W. Va., 361; 21 W. Va. 709; 23 W. Va. 229; 16 W. Va. 307; 14 S. E. Rep., 12; 34 W. Va. 667; 35 W. Va. 578; 26 W. Va. 340; 30 Gratt. 56; 2 Russ. and M. 1; 1 Redf. Wills 96; Shou. Wills 182; 2 Paige, Ch'y 147; 15 N. J. Eq. 270; 1 Jar. Wills 77; 27 Gratt. 103; 18 W. Va. 388; 4 W. Va. 729; 90 Am. Dec. 690; 17 W. Va. 683; 9 Gratt. 332; Swin. Wills 127, 128; Jar. Wills 52; Sheff. Lun. 37; 31 W. Va. 679; 4 McC. 342; 29 Gratt. 24; Jar. Wills 29; Redf. Cas. Wills 280, 725, 735–737; 4 Met. Ky. 163; 38 Mich. 238; 32 N. J. Eq. ·288; 61 Mo. 295; 33 Minn. 204; 16 Am. Dec. 253; 63 Wis. 162; 53 Hun. 398; 48 Mo. 291; 33 N. J. Eq. 514; 35 N. J. Eq. 437; 48 Ind. 503; 43 N. J. Eq. 239; 36 N. J. Eq. 269; 13 Phila. 302; 18 Hun. 403; 26 Wis. 104; 26 N. J. Eq. 523; 49 Ark. 367; 34 N. Y. 199; 99 Mass. 79; 112 W. Va 112; 1 Jar. Wills (5th Am. Ed.) 133; 35 N. Y. 559; 39 W. Va. 153; 20 W. Va. 252; 21 W. Va. 784; 63 N. Y. 213; 82 Va. 235; 32 Am. Rep. 15; 25 N. Y.; 33 W. Va. 320; 10 W. Va. 115; 21 W. Va. 291; 32 W. Va. 487; 82 Va. 34; 14 S. E. Rep. 68; 1 Burr. 392; 3 S. E. Rep. 88; 13 S. E. Rep. 654; 6 S. E. Rep. 250; Id. 727; 13 Minn. 434; 37 N. W. Rep. 449; 43 N. W. Rep. 967; 46 N. W. Rep. 149; 48 N. W. Rep. 683; 14 S. E. Rep. 901; 131 Pa. St. 220; 23 Atl. Rep. 896; 14 S. E. Rep. 529.

ENGLISH, JUDGE:

On the 21st day of November, 1887, David Findlay, who for many years had been a resident of the city of Parkersburg, Wood county, W. Va., executed a paper purporting to be his last will and testament, which paper was witnessed by F. E. Saunders and J. B. Jackson. On the 29th day of November, 1887, said David Findlay departed this life, at the age of eighty two years; and on the 3d day of December, 1887, said paper was admitted to probate in said county as the last will and testament of said David Findlay. At the time of the execution of said paper the said Findlay was under the impression that a paper he had executed on the 21st day of May, 1884, as and for his last will and testament, had been abstracted from a certain trunk or box, in which he usually kept his valuable papers; and he as-

signed that as a reason why he wished to execute the said paper dated the 21st day of November, 1887, stating to the scrivener who prepared said last-named paper that he suspected his granddaughter, Lizzie Martin, who had resided with him, of having taken said paper, and for that reason he did not intend to provide for her in his will. Subsequent to his death, said paper executed by him on the 21st day of May, 1884, was found by his executors inclosed in a deed among the papers belonging to him in said trunk or box.

On the first Monday in October, 1891, a bill was filed in the Circuit Court of Wood county by William Martin, Jesse Martin Shay, Jane Austin, Elizabeth White and Ella Martin, who sued by her next friend D. G. White against Campbell Thayer, David Mair, Walter Mair, and Jennie Mair, and David and Walter Thayer, executors of the estate of David Findlay, deceased.

The plaintiffs in said bill allege that said David Findlay was the father of three children—Campbell Findlay, who married John Thayer, Jane Findlay, who married Alexander Mair, and Elizabeth Findlay, the mother of complainants, and that at the time of his death the only daughter surviving him was Mrs. Campbell Thayer; that his deceased daughter, Mrs. Mair, left three children, who survived the said David Findlay—namely, Jennie Mair, David Mair, and Walter Mair.

They also allege that on the 1st day of May, 1884, he made his last will and testament, and that by it he divided his property among his daughter Mrs. Thayer and his children above named, and at the time of making this will, in 1884, he was advanced in years, but of usual health, and of disposing mind and memory; that by this will he gave to complainants the sum of four thousand dollars and afterwards, on the 18th day of September, 1886, he added a codicil giving to plaintiffs, in addition to said four thousand dollars a farm in Slate district in Wood county, consisting of about one hundred and five acres, described in a deed from A. E. Wardner to him; that this will and codicil were both executed according to the laws of West Virginia, and duly attested by two witnesses, and were in all respects valid

and complete, expressing his deliberate and thoughtful purpose and disposition of this property.  By item six thereof he provided that any property not disposed of thereby should be divided *per stirpes* among his living daughter and the children of his daughters who were dead.  A copy of said paper was filed as an exhibit with said bill.

They also allege that the said will of May 21, 1884, and codicil are the only true and valid last will and testament of the said David Findlay, and that they are the children of Elizabeth Findlay Martin, mentioned and intended therein, and entitled to the benefits of the provisions therein made in their favor.

They also allege that more than three years after he had made his will in 1884 he was, in the fall of 1887, taken with an extreme illness, and was afflicted with Bright's disease, which not only exhausted his waning strength, but greatly enfeebled and beclouded his mind, affecting his brain and his will; that he was confined to his bed over two weeks before he died, on the 29th day of November, 1887, at the age of eighty two years; that frequently after making his will in 1884, and up to within nine days of his death, he expressed satisfaction, and was satisfied, with the will and the codicil thereto attached; that he conceived the notion shortly before his death that said will of 1884 had been lost or destroyed or taken away, and he expressed great regret that it was, as he supposed, gone, and nine days before his death he stated that his said will of 1884 had been carefully made by him, and that as it could not be found he desired another to be made, just like it, containing the same provisions that the will of 1884 contained.

They then allege the execution of the paper on 21st day of November, 1887, purporting to be his will, and state that the same was admitted to probate on the 3rd day of December, 1887, in said county, and exhibit a copy thereof.

They also state that said paper was written, and, if executed at all, was executed about seven days before said Findlay's death, and they charge that said Findlay was not at the time of making the same of sound or disposing mind and memory; that he was then borne down with age and decrepitude, on the verge of dissolution, and by reason of

his disease, and the medicines administered, his intellect and will were almost powerless, and that he had not testamentary capacity, and was not competent to make a will, and that, from the best information they could get, he was under influences hostile to the rights and interests of complainants, none of whom had access to him in his last illness, and that undue influences were exerted, and were effectual, to induce and procure a paper which cut off complainants, except said Ella, with nothing, and gave to her less than his will had provided; and they charged that said paper executed on the 21st of November, 1887, was not, nor was any part thereof, the will of said David Findlay.

They also allege the finding of said will of 1884 among the papers of said Findlay, but that the same was not probated, and that great injustice will be done them if said will of 1887 is not canceled and annulled, and the true will, of 1884, established.

They further allege that said will of 1884 is in the hands of David Mair and Walter Thayer, who qualified as executors under said will of 1887, and pray that they be required to produce the same, and that such proceedings may be had that the paper writing of November 21, 1887, purporting to be the will of David Findlay, may be set aside, annulled, cancelled, and declared void, in whole and in every part.

On the 27th day of November, 1891, the defendants demurred to plaintiffs' bill, and also answered the same, denying that the will of 1884 was the true last will and testament of said David Findlay, and averred and charged that the will of 1884 was expressly revoked by the will of 1887, and they put in issue every material allegation of the plaintiffs' bill; and said executors allege in said answer that they proceeded to administer said estate under the provisions of said will, and in so doing they paid several amounts of money to D. G. White as guardian for Ella Martin, to D. G. White, attorney in fact for Jane Austin, and to D. G. White for his wife, Lizzie Martin White, and to William Martin and to Jesse Martin Shay; that they received said sums, and acquiesced in said administration, and were thereby estopped from controverting said will, and that they are further es-

topped by the fact that the defendants in this cause in 1888 filed a bill against complainants, and obtained a decree for the sale of a certain lot which was omitted from said will, and which was conveyed to said Findlay by S. C. Shaw, which, said bill charged, passed to the heirs at law of said Findlay. Said bill also averred that said will of 1887 was the last will of said David Findlay, and that said lot had been omitted from said will, and that, with full knowledge of these facts, they accepted their distributive shares of the proceeds of said sale of said lot; that complainants, prior to the institution of this suit, had in their possession a copy of said will of 1884, which they now seek to set up, in which it appears that said lot, sold as aforesaid, had been devised to the defendant Campbell Thayer; and a copy of said bill and proceedings was exhibited, and made a part of said answer.

The complainants joined in said demurrer, the same was set down for argument; they replied generally to said answer; on the same day it was decreed that an issue be made up to be tried at the bar of the court, before a jury, to ascertain whether any, and, if any, how much, of the paper writing bearing date on the 21st day of November, 1887, in the bill and proceedings mentioned and admitted to probate as the last will and testament of David Findlay, deceased, be the will of David Findlay, deceased, and on the trial of said issue said Campbell Thayer, David Mair, Walter Mair, and Jennie Mair were given the affirmative.

Said issue was submitted to a jury on the 21st day of December, 1891, which resulted in a verdict, on the 24th day of the same month, which found that the paper writing bearing date on the 21st day of November, 1887, in the bill and proceedings mentioned, and admitted to probate as the last will and testament of David Findlay, deceased, is not, nor is any part thereof, the will of David Findlay, deceased; and thereupon the said Campbell Thayer and others moved the court to set aside the verdict aforesaid on the ground that the same was contrary to the law and the evidence, and not supported by the evidence, which motion was sustained, and the said verdict was set aside, and a new trial

of said issue was granted, to which opinion of the court the said William Martin and others excepted; and thereupon the complainants moved the court to enter a decree according to the verdict of the jury, which motion was overruled, and to the opinion and ruling of the court in setting aside verdict and awarding a new trial the complainants, at the time of such ruling, excepted, and the complainants further excepted to the opinion and ruling of the court in refusing to enter a decree in comformity with the verdict aforesaid and tendered a bill of exceptions setting forth the evidence, which was signed and saved to them ; and from the opinion and ruling of the court in setting aside said verdict, and refusing to enter judgment in conformity therewith, the plaintiffs William Martin and others applied for and obtained this appeal.

The first error suggested by the appellants is that the court erred in setting aside the verdict and awarding the defendants a new trial. In the consideration of this question our attention is called to the recent statute (section 9 of chapter 131 of the Code of 1891) which provides :

"In the trial of a case at law, in which a writ of error or *supersedeas* lies to the court of appeals, a party may except to any action or opinion of the court, and tender a bill of exceptions; and if the action or opinion of the court be upon any question involving the evidence, or any part thereof, either upon a motion for a new trial or otherwise, the court shall certify all the evidence touching such question, and the judge shall sign any such bill of exceptions, if the truth of the case be fairly stated therein, and it shall be made part of the record in the case, and the whole of the evidence so certified shall be considered by the court of appeals, both upon the application for and hearing of the writ of error or *supersedeas.*"

This section would apparently change the rule which has been established by numerous decisions of this Court, to wit, that the appellate court will not consider the parol evidence of the objector to the verdict, so far as it is conflicting with that of the appellee, and when the evidence, thus viewed, does not show that the verdict was contrary thereto, or was not authorized thereby, the judgment should not be revers-

ed. See *Newlin* v. *Beard*, 6 W. Va. 110, seventh point of syllabus; *Miller* v. *Insurance Co.*, 12 W. Va. 116 ; *Sheff* v. *City of Huntington*, 16 W. Va. 307 ; *Dower* v. *Church*, 21 W. Va. 23, *etc.*

In determining this case, however, it is not necessary to interpret said statute, or pass upon its meaning or effect with reference to the former rulings of this Court upon the manner of considering the evidence certified upon a motion to set aside a verdict and award a new trial, for the reason that if we consider all of the evidence certified in this case including that of the exceptor, which would be giving to the statute all that could be claimed for it by the exceptor, and reading the whole evidence so certified in the light of the decisions of this and other states settling the rules in regard to granting or refusing new trials, we can not say the court below committed an error in setting aside the verdict and awarding a new trial in the case under consideration.

HAYMOND, J., in delivering the opinion of the court in the case of *Miller* v. *Insurance Co.*, 12 W. Va. 128, says:

"When a party has obtained a writ of error or *supersedeas* from this Court to the order of an inferior court granting a new trial, this Court must consider and dispose of it according to the principles of law governing an appellate court in such cases. From the authorities cited bearing upon this case, and upon principle, it seems to me that generally, where the evidence in the cause is materially conflicting as to a material point or points involved in the issue, and the Circuit Court sets aside the verdict of the jury and grants a new trial, an appellate court should not reverse the order granting such new trial. And also, where there is apparently no conflicting evidence, and the inferior court grants a new trial upon the ground that the verdict is contrary to the evidence or is not authorized by the evidence, or for any other cause, where all the facts proven are not stated in the bill of exceptions, the appellate court should not reverse the order of the court below, granting a new trial, unless it manifestly and clearly appears that that the court erred in granting the new trial. And also it seems to me, from the authorities and upon sound principle, that, generally, a stronger case should be made to justify the disturb-

ance of an order granting a new trial than where one has been refused, because in the former case the only legitimate result is another trial of the cause, at which it is to be presumed justice will be done, as near as may be; and in the latter, if the refusal be affirmed, generally the defendant is left without remedy for relief, no matter how great the injustice done him."

Also, in the case of *Reynolds* v. *Tompkins*, 23 W. Va. 229 (sections 4 and 5 of syllabus) this Court held:

"1. The court may grant a new trial when the evidence is contradictory and the verdict is against the weight of evidence, but in such a case the power of the court to grant a new trial should be cautiously exercised; and when, in such case, the court grants a new trial, its opinion is entitled to peculiar respect, and the appellate court will not reverse such order unless it is plainly wrong."

"5. A stronger case should be made to justify an appellate court in reversing an order granting, than one refusing, a new trial."

Now, in discussing the question as to whether the court below acted properly in setting aside the verdict of the jury, and granting a new trial, I call attention, first, to the fact that, although undue influence is alleged in the bill, no witness in the case, so far as I have been able to discover, intimates in the slightest manner that any influence was exercised by any person to induce the testator, David Findlay, to make an alteration in his will to the prejudice of the plaintiffs, or for any other purpose; but, on the contrary, Gov. Jackson states that at the time he was preparing the will he said to Mr. Findlay: " 'You don't know that this child has taken that will. It's a suspicion of yours, and you may be doing her a great injustice in acting upon that suspicion, and not making some provision for her.' And he very plainly intimated to me that he did not want any advice upon that question." So that, so far as the evidence discloses, the only influence attempted to be used was in behalf of the plaintiffs, and not to their prejudice.

When we look to the question as to whether want of testamentary capacity was established at the time the will of November 21, 1887, was executed, our attention must be

directed to his mental condition at the time the will was written and executed. · The question submitted to the jury was whether he at that time made a will; and the determination of that question, as a matter of course, involves the question of his mental capacity at that time to dispose of his property to such persons as he might designate. The jury were not sworn to inquire what motive prompted him to alter his former will, or whether such action was induced by some unfortunate mistake, and resulted in hardship or injustice towards one or more who had been made objects of his bounty by the will of 1884. Whatever sympathetic feelings these after-discovered facts may have created in the minds of the jury, they had nothing whatever to do with the question they were sworn to try. If David Findlay on the 21st day of November, 1887, had testamentary capacity, and exercised the same in disposing of his property on that day by making his will, it was none the less his will, although he may have been influenced to exclude parties from sharing in his bounty, under a mistaken apprehension of facts, who otherwise would not have been excluded.

In the case of *Couch* v. *Eastham*, 29 W. Va. 784 (3 S. E. Rep. 23) SNYDER, J., delivering the opinion of the court, said :

"When a testator has the legal capacity to make a will, he has the legal right to make an unequal, unjust, or unreasonable will. *Voluntas stat pro ratione. Boylan* v. *Meeker*, 28 N. J. Law. 274. The courts may construe and enforce a will, but they can neither make nor change one. That is the province of the testator alone."

And again, in the case of *Couch* v. *Eastham*, 27 W. Va. 805, JOHNSON, J., delivering the opinion of the Court, said:

"The mistake which will avail to set aside a will is a mistake as to what it contains, or as to the paper itself, not a mistake either of law or fact in the mind of the testator as to the effect of what he actually and intentionally did."

The alteration made in the will of 1884, so as to exclude his granddaughter from participating in his estate was induced by the fact, no doubt, that David Findlay had searched for said will where he usually kept it, and, failing to find it there, he suspected his granddaughter of taking it. In this he was no doubt mistaken, but it was not the

kind of mistake which would invalidate his will, if at the time he executed it, in November, 1887, his mind and memory were sufficiently sound to enable him to know and understand the business in which he was engaged when he executed said will. It was none the less his will, although he acted under a mistaken apprehension of the facts, and was prompted thereby to make the alteration to the prejudice of his grandchild.

For the purpose of applying this test we refer to the testimony of those who were present at the time he executed it. J. B. Jackson, who prepared the instrument, in answer to the question, "What do you know of his last will and testament—what had you to do with its preparation?" stated that "on the day the will bears date, I was at my residence, in this city, when Mr. Thomas Saunders called upon me, stating that he was sent by Mr. Findlay for me to go to his house to prepare his will—to write his will; and in pursuance of that request I went with Mr. Saunders to the house in which Mr. Findlay then lived, for that purpose."

When asked how he found him, and where, answered: "I went to the house, was admitted, and went up stairs to Mr. Findlay's room, Mr. Saunders going with me. When I got into the room I found Mr. Findlay in bed. I spoke to him, and he said that he wanted me to write a will for him; that he sent for me for that purpose; and I told him that I came there with that understanding, and was ready to proceed with the business, if he desired it."

After detailing the preparation made for writing, he further says: "He then commenced dictating his will, saying that he had made a will some time ago, and that he had desired to make an alteration in it; that he had looked for it in the place where he had deposited it, amongst his private papers and deeds, and he was unable to find that paper, and did not know what had become of it—was afraid that it had probably been taken away—and, as he wanted to make an alteration in it, and as that could not be found, that he would have to have a new one written, altogether. He commenced giving me directions as to which portions of his property were to be given to the persons represented by

him as those he desired to make devises to. He named them over, and named the property. Not being familiar with the various pieces of property, after he would announce a piece of property that he desired to give to some one, I would ask him a question as to the description, so that I might be able to put it down more definitely than what he had given it. Mr. Saunders, who was in the room during the whole time, would sometimes speak up, and direct my attention as to which corner or which street it was on, so that I might be able to describe it more particularly. The old man seemed to be suffering somewhat—some pain. He appeared to be right restless. I am positive that at one, and I think, perhaps, two or three times, during the time I was writing the will, he would get up and sit on the side of the bed, rest himself awhile, and then lie down. After having dictated to me to whom he desired to give the various pieces of property and his bank stocks, how they were to be divided, and putting it down, I asked him if that was all, and he indicated that was all. I then told him, if he would give me his attention, I would read it over to him — just how I had worded it—and he told me to do so. I read it over very carefully and slowly, so that he might comprehend the language I had used, and after I had gotten through he told me that was all right. I asked him then if he desired to sign it, and he said he did. I then handed him the paper, and Mr. Saunders and I got up and stood beside him, and he (my recollection is) threw his limbs out over the side of the bed, and sat there, and wrote his name on his lap in our presence, we seeing him sign it; and we then immediately attested it in his presence, after I had asked him if that was his will, and if that was the disposition he desired to make of his property."

When asked as to his capacity at the time, he answered: "I haven't the shadow of a doubt but that he was of sound mind and disposing memory. I had known him, as I stated, a good many years, and transacted business with him. His directions were clear and explicit to me, except the simple fact that he appeared to be suffering considerable pain, and made complaint of his suffering, and I saw nothing in his actions and conversation that indicated to me but what he was of perfectly sound mind."

When asked in regard to any one in his presence using undue influence to get him to make any of the provisions or devises in said will, he answered: "I can say this: nobody suggested to me anything to go into that will, except Mr. David Findlay, further than the fact that when he directed, perhaps, one or two pieces of property to go to some one of the devisees, Mr. Saunders would speak up and give some description of the property that was more definite than I had, so that I might identify it."

The other subscribing witness to said will, while he appears to have forgotten nearly all of the details connected with the execution of said will, states that the answers made by said Findlay to questions asked him by Gov. Jackson, were intelligent, and, when asked if said Findlay knew for what purpose he had brought Gov. Jackson there, answered: "I suppose he did. He sent me after him"—and, when asked, "Well, all the conversation that the old gentleman had there with you and Gov. Jackson, and all the answers he made, were rational and intelligent, so far as you remember?" answered, "Yes, sir. He was a little slow in answering questions; but then, give him time, and he would do it"—and, when asked if he knew the business he was engaged in that morning, answered, "I think so." He further states that he saw said Findlay write his name to said will that was made that day, and, when shown his signature as a witness there, recognized it as his own, and, when his attention was called to the signature of Findlay to said will, he answered: "Well, that is about his way of writing, although he generally wrote a little better hand than that. This must have been written while he was sick"—and afterwards stated he did not know that was the will when it was handed to him, and when informed that the paper handed him was the will, and asked if that was the usual and ordinary way in which he wrote his name, answered: "Oh, no. The general outline of it is a good deal his handwriting. He was like myself: he did not write the best of hands."

Dr. Williamson, his attending physician, when asked, "Tell the jury, doctor, from your knowledge of his condition and his intelligence and will power, whether, in your judg-

ment, he had sufficient capacity to make a will, up to within a week or ten days of his death," answered:

"Well, he would be capable of making a will part of that time. I do not think his mind was very clear during part of that time—not as clear as though he had not been sick. It is a disease with a good deal of nervous trouble attending it—a good deal of brain trouble. A man don't feel very much like doing business, as much as he would when he was well."

When asked, "As his attending physician, do you remember of his being out of his mind at any time during the first two weeks of his illness?" answered, "No, sir. I can not say that I do. I have a bad recollection of his condition, and gave it as I can recollect it. I did not suppose I would be called up, and had no more thought about it, but I do not recollect of his being out of his mind. But in the latter few days he was entirely out of his mind"—and afterwards, in answer to a question, stated that "for about three or four days he was entirely in that condition"—and again, when asked, "Towards the latter end of Mr. Findlay's life, and during his last illness, was he not at the time unconscious and in a torpor?" answered: "Well, the latter few days he was. I do not recollect previous to that. I do not know anything about the time. I could not fix any particular time, but he was gradually going down; but he retained his mental faculties very well up to the latter part of his sickness."

Now, these are the witnesses whose testimony tends to show the mental condition of the testator at the time the will was executed; and this Court held in the case of *Kerr* v. *Lunsford*, 31 W. Va. 661 (8 S. E. Rep. 493) 18th point of syllabus: "The time to be looked to by the jury in determining the capacity of the testator to make a will is the time when the will was executed." The only persons present were the witnesses Jackson and Saunders, and, while the memory of the latter appears to be somewhat vague and uncertain as to what did occur at the time, yet he states that David Findlay knew what J. B. Jackson was there for; that he sent him after him. He admits that "a heap of things occurred that he did not recollect;" that Findlay

knew what he was doing that morning—knew the business he was engaged in that morning—and that he had no recollection of anything said Findlay did not understand when the will was read to him; and that he knew it was his will when he signed it.

J. B. Jackson states that he had not the shadow of a doubt but that he was of sound mind and disposing memory. "He had known him for years, and had transacted business with him, and his directions were clear and explicit to him." Jackson was there as his attorney, for the purpose of drawing his will. In order to do so it was necessary that he should elicit from Findlay the requisite information, and in this way his attention was directly called to his mental condition. Again, J. B. Jackson was a subscribing witness to the will, and we find that Schouler, in his valuable work on Wills, at section 178, says: "Great weight is attached to what these subscribing witnesses may have to say concerning the testator's apparent mental condition, and all the circumstances surrounding the execution of the will."

The same author, at section 102, says: "No person, says Chancellor WALWORTH on this point, in clear and emphatic language, is justified in putting his name as a subscribing witness to a will unless he knows, from the testator himself, that he understands what he is doing. The witness should also be satisfied, from his own knowledge of the state of the testator's mental capacity, that he is of sound and disposing mind and memory. By placing his name to the instrument the witness, in effect, certifies to his knowledge of the mental capacity of the testator, and that the will was executed by him freely and understandingly, with a full knowledge of its contents. Such is the legal effect of the signature of the witness when he is dead, or is out of the jurisdiction of the court." See, also, section 198 of the same work on the same subject.

In the case of *Webb* v. *Dye*, 18 W. Va. 376, this Court held: "The question of the due execution of a will is to be determined, like any other, in view of the legitimate evidence in the case, and no controlling effect is to be given to the testimony of the subscribing witnesses. Their di-

rect participation in the transaction must, of course, under ordinary circumstances, give great weight to their testimony; but it is liable to be rebutted by other evidence, either direct or circumstantial."

In the case under consideration the subscribing witnesses were the only persons present at the time the will was executed. They detail what was said and done at the time the paper was executed, and their evidence is in no way rebutted. It occurs to me that the best evidence of said testator's mental capacity to execute a will on the day this one bears date is derived from the fact that he sent for an attorney to prepare his will, and upon his arrival, whatever he might have said to Mr. Saunders at a former time in regard to being satisfied with the will of 1884, he then informed said attorney that he wished to make an alteration in said former will, and proceeded to dictate the terms and provisions of his will, which was prepared under his directions, designating the different parcels of property he wished to dispose of, and naming the parties he desired to share in his bounty; and it appears from the face of the will that the property so disposed of consisted of several lots in the city of Parkersburg, two tracts of land in the county of Wood, and shares of stock in three different national banks, which were directed to be distributed among different parties, and one tract of land was devised to his executors to be sold for the benefit of his church; and while it is true that he omitted to dispose of one lot in said city, and, Mr. Saunders thinks, probably a note on one of the Rectors, yet we can not say whether this property was omitted by reason of want of memory on the part of the testator, or by design, as he directed his just debts and a pecuniary legacy to be paid out of his estate by his executors.

The witness Saunders also says that he failed to remember the name of Lizzie, one of his grandchildren, and he had to go to another room to inquire. Now, it is well known that the failure to remember names is an incident of old age; and, while he could not call the name, he remembered the person, and the disposition he wished to make in his will in regard to her.

In the case of *Nicholas* v. *Kershner*, 20 W. Va. 251, this Court held : "The testamentary capacity is sufficient if the testator understands the nature of the business in which he is engaged, has a recollection of the property which he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them ;" *. * * "Where there is a free exercise of legal capacity, it is enough. The will in such case can not be impeached, however unreasonable or unaccountable it may seem to the jury or others." * * * "Testator need not name all his children, or give all a portion. He may give all to strangers. It will not be invalid because of resentment to some, and attachment to others, he gives all his property to some of his children, and none to others," *etc.*

Now, both of the witnesses who were present when the will was executed agree that he understood the nature of the business he was engaged in ; that he recollected the property he disposed of, the objects of his bounty, and designated the manner in which he wished to distribute his property ; and, although he may have failed to remember the name of Lizzie, he was very decided in his determination not to make any provision for her, and, when remonstrated with by Gov. Jackson, he "very plainly intimated to him that he did not want any advice upon that question."

What he said and did on the day the will was executed is the best evidence of what he was capable of doing at that time. Without referring to or commenting upon the testimony of William Campbell and wife, who were neighbors and intimate friends of said Findlay, and who testify to his competency up to a few days before his death, I am of opinion that the evidence of those who were with him and conversed with him when the will was executed was sufficient to warrant the court below in setting the verdict aside.

Following the ruling of this Court in the case of *Reynolds* v. *Tompkins, supra*, "the court below, with all the witnesses before it, with the opportunity of seeing the witnesses and hearing them testify, having granted a new trial, its opinion in so doing is entitled to peculiar respect, and we should not reverse such order unless it is plainly wrong ;"

and my conclusion being, upon a review of the entire case, that the court below was warranted in setting aside said verdict, the order complained of must be affirmed, with costs and damages.

The appellants assign as error the refusal of the Circuit Court to allow Lizzie Martin White and Ella Martin to testify in the case before the jury, and while we can not regard this action of the court as material upon the question before us, upon appeal, as to the propriety of the ruling of the court below in granting a new trial, the verdict of the jury having given plaintiffs all they claimed, see *Ruffner* v. *Hill*, 31 W. Va. 431 (7 S. E. Rep. 13) yet, as the case must be remanded, in order that another trial may be had, we will say that said witnesses should have been allowed to testify as to any matter pertaining to the issue, other than personal transactions or communications had with David Findlay, deceased.

LUCAS, PRESIDENT:

I concur in the conclusion reached in this case, and unite in the syllabus. I think, however, that the first point of the syllabus will be better understood when accompanied with comment.

The decision of the Circuit Court in granting or refusing a new trial is always entitled to peculiar respect; but I do not concur in the modern view that it is entitled to more respect when the new trial is granted than when it is refused. Notwithstanding the *dicta* upon this subject by our own Court and the courts of several other states, I can not but believe that the verdict of the jury upon questions of fact, confirmed by the decision of the trial court in its favor thus evincing the concurring minds of thirteen persons present at the trial, with full opportunity to note the character and observe the demeanor of the witnesses, is entitled to peculiar respect, and, where the question is one of fact only, is entitled to as much or even greater weight than where twelve men have found the facts one way, and the thirteenth man, who presided at the trial, has dissented.

When it is said, therefore, that this Court ought not to interfere and reverse an order granting a new trial, unless

it is plainly wrong, it is, in my opinion, only meant by the proposition to re-affirm the old and established doctrine of the common-law, so long and universally concurred in by the court of appeals of Virginia and of this state, viz., that no judge ought to interfere with the verdict or set it aside, unless the evidence tending to support it is so insufficient as to shock the common judgment of mankind, and to indicate that the jury has been influenced by prejudice, partiality, or plain and palpable mistake. This has been the doctrine for centuries, and I do not conceive that the recent legislation upon this subject (see Act of 1891, and section 9 of chapter 131 of the Code) was intended or could be properly construed to be an attempt to break in upon, or destroy, or in any degree impair, the long established canons of practice and judicial decision.

I have thought this precautionary note should accompany the opinion and syllabus in this case, in order that the views of the Court might not be misinterpreted or misunderstood.

The practice in most of our sister states has long been to send up the evidence, instead of the facts proved. This practice I have always thought preferable to our own, but its prevalance has not in any of our sister states, so far as I know, been supposed to abolish the common-law rule, now hoary with the frost of centuries, that it is the peculiar province of the jury to pass upon the facts, and that their verdict ought not to be disturbed except where evidence of partiality, prejudice, or mistake is apparent.

For his *dictum* in *Miller* v. *Insurance Co.*, 12 W. Va. 128, Judge HAYMOND cites no authorities; and those cited by counsel are only persuasive, and at variance with the spirit of our older Virginia decisions; and the reason assigned for paying greater respect to the action of the Circuit Court in setting aside a verdict than in refusing to interfere with it is very unsatisfactory, and is therefore entitled to no weight. That reason is that the defendant, when the verdict is set aside, thereby obtains another chance to adduce his evidence, or, if he thinks proper, to produce further evidence at the new trial. This reason is totally unsatisfactory. The plaintiff having obtained a verdict at the hands of the pro-

per and legitimate tribunal for the decision of questions of fact is entitled to its award, and ought not to be put to the disadvantage of renewed litigation, except in accordance with and obedience to the principles of the common-law, as before announced.

The general principle upon this subject is thus laid down by Mr. Hillard:

"A new trial may be granted on this ground (that the verdict is against evidence) though a particular fact is left to the jury, which they find. But no ground of new trial is more carefully scrutinized or more rigidly limited. It is regarded as inconsistent with the established maxim of law, '*ad questionem legis, judices, ad questionem facti, juratores, respondent.*' It is said: 'Courts should rarely take it upon themselves to decide on the effect of evidence. Were they so to act they might, with truth, be charged with usurping the privileges of the jury. If it is clearly wrong, it must do so. If we only doubt its correctness, we must let it alone. We are not satisfied that the verdict of the jury was right. But this is not enough. A mere difference of opinion between the court and jury does not warrant the former in setting aside the finding of the latter. That would be, in effect, to abolish the institution of juries, and substitute the court to try all questions of fact.' And the distinction is made that it is the duty of the court to determine upon the competence of evidence, and not upon its sufficiency; and a verdict ought not to be set aside although it should be the opinion of the court that the evidence was not sufficient to justify it; that a jury might find a fact from slight evidence, if it is competent; and that the evidence must be clearly insufficient to warrant the verdict to authorize the granting of a new trial, especially by an appellate court." * * * "Hence it is the prevailing rule that a verdict will not be set aside unless clearly, palpably, decidedly, and strongly against the evidence, or so much against the weight of evidence as on the first blush of it to shock the sense of justice, or unless there has been a flagrant abuse of discretion; that courts will never, in the absence of the most satisfactory evidence that the verdict is erroneous, substitute their impressions for the opinion

of the jury." Hill New Trials, p. 448 *et seq.*, c. 14, §§ 8–12.

I believe the above quotation from Mr. Hilliard properly defines the law of new trials in this State, and whenever the principles therein announced have been violated by the Circuit Court, whether in granting or refusing a new trial, its action is "clearly wrong," and when brought to the attention of this Court for review should be reversed with absolute indifference and impartiality as to the question, whether the lower court set aside the verdict or confirmed it. *Brugh* v. *Shanks*, 5 Leigh 598; *Mays* v. *Callison*, 6 Leigh 230; *Patterson* v. *Ford*, 2 Gratt. 19; *Hill* v. *Com.*, Id. 595; *Grayson* v. *Com.*, 7 Gratt. 613; *Campbell* v. *Lynn*, 7 W. Va. 665; *Miller* v. *Insurance Co.*, 12 W. Va. 116; *Newlin* v. *Beard*, 6 W. Va. 110; *Sheff* v. *Huntington*, 16 W. Va. 308 (syllabus p'ts 12, 13, 14;) *Reynolds* v. *Tompkins*, 23 W. Va. 229; *Probst* v. *Braeunlic*, 24 W. Va. 357.

Judge HOLT concurs with me in the views expressed in this note.

REMANDED.

---

# CHARLESTON.

