Albert Jorn, Jr., Appellant, v. Harold J. Tallett, Executor of instrument purporting to be the Last Will and Testament of Albert Jorn, Sr., Deceased et al., Appellees.

Gen. No. 10,397.

Heard in this court at the October term, 1949. ■■■■■■■ Opinion filed June 6, 1950. Released for publication June 26, 1950.

JAMES D. PETERSON, of Chicago, RUNYARD & BEHANNA, and FRED B. MEYER, all of Waukegan, for appellant.

MAX PRZYBORSKI, of North Chicago, for appellees.

MR. JUSTICE BRISTOW delivered the opinion of the court.

This appeal comes from the circuit court of Lake county, Illinois and questions the propriety of a decree entered by the court after a trial without a jury sustaining the validity of the will of Albert Jorn, Sr., which was executed on August 7, 1947 and admitted to probate on August 5, 1948.

The complaint filed in this case charged that the testator did not have the mental capacity to know the extent of his property and the natural objects of his bounty and that at the time of the execution of his last will, he was under the undue influence of one Anne E. Bushman.

Albert Jorn, Sr. executed the will in question on August 7, 1947 at his home in Waukegan, Illinois. He died on February 19, 1948 at the age of eighty-five years. The record discloses that about one year prior to the execution of the will there was a trust agreement signed by Albert Jorn. According to the terms of this instrument and of the will under consideration,

his only heir, a son, participated very meagerly in the distribution of an estate of the approximate value of $75,000.

On July 7, 1942, the plaintiff caused his father to be committed to the Elgin State Hospital and he then took over the control of his property. Only two months thereafter Mr. Jorn, Sr. was discharged from that institution and was declared to be a person without "psychosis" and "not insane," and he was restored to all his rights by the county court of Lake county on October 16, 1944. Subsequently, on August 2, 1946, he was adjudicated by the probate court of that county to be a fit person to have the care and management of his property.

From 1939 to 1944, the testator lived with the plaintiff and his daughter-in-law. Mr. Jorn entertained the thought that during his stay with his daughter-in-law, she attempted to destroy his life by poison. It is claimed by the plaintiff that his wife was not guilty; that the claims of his father in that regard were preposterous; and that his father therefore was suffering from insane delusions.

The record also discloses that soon after the poisoning episode Mr. Jorn discontinued living with his son, found companionship and social comfort in having live and work in his home a woman who appeared to have a husband and eight children in New York City. Plaintiff contends in this suit that Mr. Jorn labored under the delusion that the two younger children born to the woman were begotten by him. There were some letters introduced in evidence which appear to support plaintiff in this contention.

On behalf of plaintiff there was called a Dr. Benjamin Lemery who testified that he first saw Mr. Jorn in August 1947. He said he was pale and emaciated and that he would not talk to him unless he was alone, and that he twice told the doctor that his son's wife

wanted to poison him and twice tried to do so. He further testified that Mr. Jorn was "not in sound mind" but that he apparently knew what he was doing.

Dr. Robert G. Smith, who testified for the plaintiff, said that he attended Mr. Jorn in 1939 for pneumonia; that he had some heart disease; that he never saw Mr. Jorn after 1941 until 1945, when he saw him for about fifteen minutes, at which time Mr. Jorn didn't seem to recognize him and that it was his opinion that Mr. Jorn was senile.

Sheldon R. Olson, an employee of the Continental Illinois National Bank & Trust Company testified concerning the trust agreement which Mr. Jorn executed on August 3, 1946. We do not consider its provisions important in deciding the issues presented, so we will omit detailing them.

The only other witness called by plaintiff was Albert T. Jorn, his son. He had not seen his grandfather since 1944. He testified that his grandfather had lived in his father's home from 1939 to 1943 and that his opinion that he was of unsound mind was based upon his observations during that period. His testimony was rather lengthy, and he detailed many circumstances that denoted behavior on the part of his grandfather that should afford a reasonable basis for such an opinion.

On behalf of the defendant and in support of the validity of the will, there appeared the following testimony:

Charles B. Hudson testified that he had seen Mr. Jorn two or three times a week during the two years immediately preceding his death. He described those occasions as friendly visits which lasted two, three and four hours. He said that Mr. Jorn carried on general conversation well and that his mental condition was good.

243

Raymond W. Christian testified that he had known Mr. Jorn most of his life; that during the six months' period extending from August 1947 to February 1948, Mr. Jorn stayed at his brother's house where he saw him several times each week. On those occasions, he would see him play cribbage with his brother, and that in doing so he was able to count his points accurately. He saw him play solitaire and observed that he did so correctly and without cheating. It was this witness's opinion also that Mr. Jorn was of sound mind.

Arthur A. Maes said that he had known Mr. Jorn since 1924. He had visited with him shortly before the will was executed and was of the opinion that he possessed a wonderful memory.

The subscribing witnesses to the will, Dorine De-Luca and Thomas G. Przyborski, also testified that Mr. Jorn was of sound mind at the time of the execution of the instrument under question and that no fraud, compulsion, or undue influence were in evidence at that time.

The plaintiff apparently abandoned the charge that the will of Mr. Jorn was the result of undue influence on the part of Anne E. Bushman. The only testimony on this issue was that of the subscribing witnesses which negative any such contention.

 Much is said in appellant's brief on the subject that because of the insane delusions of the testator he was in such a state of mind that he was incapable of making a valid will. There does not appear to be any relationship between these alleged delusions and the disposition he made of his property in his will. One of the delusions referred to was that Mr. Jorn entertained the thought that his daughter-in-law attempted to poison him. His report of that incident was as follows: he had been served a dessert different from the others. After the meal he was washing dishes at the sink and suddenly became dizzy and after reach-

ing his room he vomited for about two hours. He reported that Dr. Smith was called who only talked with his daughter-in-law and did not examine him but pronounced with a grin "indigestion." Mr. Jorn called another doctor, a Dr. Palmer, who made a thorough examination and said it was not indigestion. Mr. Jorn also related that when he became dizzy at the sink that his daughter-in-law in a sassy fashion told him to get away as though his sickness was not altogether unexpected. He also reported that she had tampered with a bottle of his medicine. Was Mr. Jorn's process of thinking on the subject of his being poisoned by his son's wife so fantastic that it could reasonably be denominated as insane delusion? A complete answer to this inquiry can be found in the case of *Owen v. Crumbaugh*, 228 Ill. 380, where the court used this language at page 401: "Whatever form of words is chosen to express the legal meaning of an insane delusion, it is clear, under all of the authorities, that it must be such an aberration as indicates an unsound or deranged condition of the mental faculties as distinguished from a mere belief in the existence or non-existence of certain supposed facts or phenomena based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. An insane delusion is not established when the court is able to understand how a person situated as the testator was, might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. Thus, where the testator has actual grounds for the suspicion of the existence of something in which he believes, though in fact not well founded and disbelieved by others, the misapprehension of the fact is not a matter of delusion which will invalidate his will. *Stackhouse v. Horton,* 15 N. J. Eq. 202; *Potter v. Jones*

[20 Ore. 239], *supra; Martin v. Thayer,* 37 W. Va. 38; *Mullins v. Cottrell* [41 Miss. 291], *supra.''*

The trial judge wrote a short memorandum opinion giving his reasons for sustaining the validity of testator's will. It was his observation that the lay witnesses who testified for the defendant had a better opportunity to observe the testator than the doctors who appeared for the plaintiff, and accordingly their opinions were entitled to greater weight. The chancellor's findings should not be disturbed unless they are palpably wrong. A careful reading of the records convinces us we cannot so hold. The trial judge who sees and hears witnesses is in a much superior position to find the truth than the reviewing court who has before it only the printed page. Well worth repeating in this connection is the language of the judge of the Supreme Court of Missouri in the case of *Creamer v. Bivert,* 214 Mo. 473, 113 S. W. 1118. ''He (Trial Court) sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sign, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson or the itching over-eagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of

light and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify.''

We are of the opinion that the decree entered herein should be affirmed.

*Decree affirmed.*