**People of the State of Illinois, Plaintiff-Appellee,
v. Clarence Porter, Defendant-Appellant.**

**Gen. No. 50,265.**

First District, Fourth Division.

May 13, 1966.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Thomas P. Cawley and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Klein, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

The defendant, Clarence Porter, was found guilty of rape after a bench trial and was sentenced to the penitentiary for a term of not less than five nor more than twelve years. In this appeal defendant contends that the element of force was not established and that his identification was not sufficiently positive.

The complaining witness, Della Beasley, testified and stated that she was nine years old and that on the evening of May 13, 1964, she was babysitting in the apartment of Minnie Harris where the alleged rape took place. The remainder of her testimony in relevant part is as follows:

> Miss Minnie left the basement apartment with Joe and Clarence Porter. I see Clarence Porter here in court. After they left, Clarence Porter came back. Clarence Porter came back, one of Minnie's children opened the door. He took me in the bathroom and laid me on the floor. He told me if I don't shut

up he'd choke me. He got on top of me. Then I told him to get off and he wouldn't get off. Then he took me in Miss Minnie's room. He laid me on the bed. Then I told him to get up and he wouldn't get up. Then he pee'd on me. When I went to Minnie's apartment I did not have any underclothes on. He put his stick in me and I told him to get off and he wouldn't get off. Then I heard somebody knocking. The little girl said, "Who is it?" And he said, "Shut up." Then he got up and ran out the back door. I went in the kitchen and locked the door. Then I came back and then I told Miss Minnie what happened. She called the police. I went to the hospital. I never saw Clarence Porter before that night. The man who came back was the man who walked out with Minnie and Joe, and that is the same man that's in the courtroom. I had blood on me that day. It was not on my clothes. The night I was babysitting, there was blood on me after Clarence Porter came back. There was no blood on my clothing that night. My dress was up.

On cross-examination she stated that:

All three of those people left the apartment about two hours after I arrived. It was dark when I arrived at the apartment. While I was in the apartment I was playing in the bedroom with Minnie's children. The three adults stayed in the front room. I did not enter the front room at all. When I first entered the apartment, I went in the front room and remained for a minute. Then Minnie told me to take care of the children. I left the room. I did not return to the front room again.

. . . . . .

I had never seen him [defendant] before that day. I took a real good look at him that day. I

440

don't know what he had on; what kind of clothes. He had a mustache.

The witness offered no response to questions on cross-examination as to the reason she was sure that it was the defendant who committed the alleged rape and after repeated questioning finally stated that it could have been a man other than Clarence Porter. However, on redirect examination the witness again identified Clarence Porter as the assailant.

Minnie Harris testified and stated that:

On May 13, 1964 I lived at 708 South Central Park. In my home with me at that time were Joe Andrews, and a boy named Clarence Porter. Also, Della Beasley, and my other children. Della Beasley arrived after Clarence Porter arrived. Clarence Porter had on black pants, white shirt, green sweater, and a brown coat. He did not take his sweater off while I was there. I went to the store while Clarence Porter and Joe Andrews were in my apartment with my children. I returned from the store and later left again with Joe Andrews and Clarence Porter. When we left together, Clarence Porter had the green sweater on. I saw the sweater again wrapped up in the blanket. And there was some blood in the bed and the bed was wet, and I found her slip [referring to Della] halfway up in the bed mattress and it was wet and had some blood on it.

． ． ． ． ． ．

Earlier that evening, I left the apartment [at approximately 9:30 p. m.] with Porter and Andrews. I went over to a friend of mine to pick up a dress. We went up to the corner, like a store and a tavern together, so we made a phone call to call a cab and so Clarence and Joe Andrews went on with me to pick up the dress, so Clarence stayed on the corner.

> When I returned home, I saw Della Beasley. All my kids were on top of her, she was wet and I took her in the bedroom and looked to see if there was anything wrong with her; I looked at my little girl, nothing was wrong with her; then I looked at her and seen she was wet and her panties was bloody. I called the police.

The witness also stated that she and Joe Andrews left the defendant at about 9:40 p. m. and that they returned home at approximately 10:00 p. m.

Joe Andrews testified and identified the sweater described by Minnie Harris as belonging to the defendant. He also stated that defendant was wearing the sweater at the home of Minnie Harris and that he never saw him take it off. Andrews testified that he, Minnie Harris and defendant left the apartment of Minnie Harris at about 8:00 p. m. but did not know at what hour they returned thereto.

Ethel Beasley, mother of Della, testified that on the date in question Della requested that she be allowed to babysit for Minnie Harris and that she took Della to Cook County Hospital later that evening.

Dr. Ozeilek Gorkmen testified that he is employed at the Cook County Hospital and that:

> I examined the child, I put a speculum in her vagina. I found a small laceration on the hymen at four— and there is a small erosion in the anterious wall of the vagina.
>
> This laceration was on the hymen, it was a small one, and to my opinion, anything inserted in the vagina can cause this laceration.

Detective John Cioe testified that he placed Clarence Porter under arrest on May 14, 1964, at approximately 6:30 a. m. He further stated that:

. . Then I asked him again what he had done to the girl and he wouldn't say. I asked him if he had intercourse with her and at this time he said, "I don't know why I did this." He said, "Send me back, send me back to the hospital." I asked him, "Which hospital?" He said, "Chicago State." I asked him if he would give me a written statement as to what went on and he said he would. We started the statement but we never got through with it, he began fumbling about the room, fell down, he said he was having an attack, to get him to a doctor, so, we did. That ended our interview.

On cross-examination Detective Cioe testified that:

I was in the interrogation room with the defendant, I would say, between a half hour and forty-five minutes. During this period no one else was in the room that would hear Clarence Porter's statement. During the interrogation he admitted having committed this rape. I interrogated the defendant about five minutes I'd say before he admitted it. In other words, he admitted to it pretty quickly. I did not call for a court reporter or a stenographer at that time. That is the usual procedure; to reduce this to writing, but it would be done by me. I would take the statement myself. There is a reason why I didn't take the statement in this case. I started to take the statement, I got the heading in and when I started—I asked him his name, address and date of birth, a normal first question, and at this time he went into his apparent seizure and we called for a squadrol, he said "Get me to a hospital." And we did.

. . . . . .

443

In the ordinary course of police work, I would not always call another policeman into the room to witness the statement. You see, that is theory, but there are many occasions in the area that I work in where you just don't have the manpower to do this.

Dr. Emanuel Dvorak testified that he is employed by the City of Chicago at the House of Correction and that:

The police brought in Clarence Porter on a stretcher. I examined him and, he was shackled and uncontrollable, he was mumbling, his words were disassociated, suddenly he got a convulsive seizure.

He was in a convulsive seizure and of course he was speechless at the moment, his head was thrown around from side to side in the carrier, in the litter. I did not run any tests down there to determine whether or not the defendant was under the influence of narcotics.

Defendant testified in his own behalf and denied committing the alleged rape. Defendant further stated that he had loaned the green sweater which was found by Minnie Harris to Joe Andrews and also corroborated the testimony of Minnie Harris as to the hour they left her apartment (about 9:30 p. m.) and the time they parted company (about ten or fifteen minutes later). With regard to his activities after he left Andrews and Minnie Harris the defendant stated that:

. . . I went down to Harrison and Pulaski and went to the Zodiac. I walked to the Zodiac. When I got to the Zodiac I went inside and stayed there a little while and I came outside and I was talking to a fellow named Robert, and the[n] Elijah came in the door, came in the entrance of the door. This was about five or ten minutes after 10 . . . . We had a conversation and then we left. That was about 11:00.

444

Elijah Perkins testified that he had known Clarence Porter about eight or ten years; that he saw the defendant standing in front of the Zodiac at approximately 10:15 p. m. on the night in question; and that he didn't know whether the defendant had been in the tavern previously that evening.

Robert, referred to by the defendant in his alibi testimony, did not testify.

 Defendant first argues that the element of force was not established since the nine-year-old complaining witness did not state in her testimony that she was physically harmed, that she was placed in fear for her life or that she fought with her assailant. The testimony of Della Beasley indicates that the defendant threatened to choke her if she didn't shut up; that defendant was lying on top of her; and that she told him to get off. In People v. Smith, 32 Ill2d 88, 203 NE2d 879, the court stated at page 92 that:

> However, resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female, nor where she is overcome by superior strength or paralyzed by fear.

We find that the element of force was established beyond a reasonable doubt.

 Defendant next argues that his identification was vague, doubtful and uncertain and therefore he was not proven guilty beyond a reasonable doubt. The record shows that (1) while the nine-year-old complaining witness waivered somewhat under intense questioning during cross-examination her identification of the accused both on direct and redirect examination was positive; (2) the sweater which was found in the bed was positively identified as belonging to the defendant and there was evidence from which the trial judge could believe that it was the defendant who left it there; (3) the period of time that Minnie Harris was absent from her

445

apartment was short; and (4) the evidence was insufficient to prove that defendant's verbal admissions to Detective Cioe were attributable to epilepsy or narcotic withdrawal. The trial judge heard the evidence, saw the witnesses and properly determined the weight and credibility to be given their testimony. As stated by the court in Jorn v. Tallett, 341 Ill App 240, 93 NE2d 82, at pages 246, 247:

The trial judge who sees and hears witnesses is in a much superior position to find the truth than the reviewing court who has before it only the printed page. Well worth repeating in this connection is the language of the judge of the Supreme Court of Missouri in the case of Creamer v. Bivert, 214 Mo 473, 113 SW 1118. "He (Trial Court) sees and hears much we cannot see and hear. We well know there are things of pith that cannot be preserved in or shown by the written page of a bill of exceptions. Truth does not always stalk boldly forth naked, but modest withal, in a printed abstract in a court of last resort. She oft hides in nooks and crannies visible only to the mind's eye of the judge who tries the case. To him appears the furtive glance, the blush of conscious shame, the hesitation, the sincere or the flippant or sneering tone, the heat, the calmness, the yawn, the sign, the candor or lack of it, the scant or full realization of the solemnity of an oath, the carriage and mien. The brazen face of the liar, the glibness of the schooled witness in reciting a lesson or the itching over-eagerness of the swift witness, as well as honest face of the truthful one, are alone seen by him. In short, one witness may give testimony that reads in print, here, as if falling from the lips of an angel of light and yet not a soul who heard it, nisi, believed a word of it; and another witness may testify so that it reads

brokenly and obscurely in print, and yet there was that about the witness that carried conviction of truth to every soul who heard him testify."

We will not substitute our judgment for that of the trial judge. People v. Clark, 30 Ill2d 216, 195 NE2d 631. We find that the defendant was proven guilty of rape beyond a reasonable doubt and therefore the judgment of the trial court is affirmed.

Affirmed.

ENGLISH and McCORMICK, JJ., concur.