79 S.E.2d 123 (1953)
RITZ et al.
v.
KINGDON et al.
No. 10551.
Supreme Court of Appeals of West Virginia.
Submitted September 29, 1953.
Decided December 18, 1953.
*127 Richardson, Hudgins & Hancock, Bluefield, for appellants.
Sanders & Smoot, Bluefield, Burton & Griffith, Princeton, Katz & Katz, Bluefield, for appellees. *124 *125
*126 HAYMOND, President.
This suit in equity was instituted in the Circuit Court of Mercer County in October, 1951, by Stuart L. Ritz, Jean Ritz Marshall, Kathryn Johnson Hurd, Nancy Johnson Sigford, Rose Johnson Robinson and Jean Johnson Crouch, against Alva Ritz Kingdon, individually, Alva Ritz Kingdon, Executrix of the last will and testament of James M. Ritz, deceased, and Charles L. Ritz, to impeach a testamentary writing dated July 10, 1950, and admitted to probate in the office of the Clerk of the County Court of Mercer County on January 2, 1951, as the last will and testament of James M. Ritz, who died in Bluefield on December 29, 1950. The plaintiff Stuart L. Ritz is a brother, and the other plaintiffs are nieces of James M. Ritz. The defendant Alva Ritz Kingdon is a sister and the defendant Charles L. Ritz is a brother of the decedent. By their bill of complaint and amended and supplemental bill of complaint the plaintiffs attack the written instrument dated July 10, 1950, probated January 2, 1951, and an earlier written instrument signed by James M. Ritz and dated May 2, 1950, on the ground that at the time of the execution of each writing James M. Ritz was mentally incompetent to execute a valid will and that each writing was procured and obtained by undue influence exerted upon him by the defendant Alva Ritz Kingdon who is named as the principal beneficiary in each instrument. By their answer and amended answer the defendants denied the material allegations of the bills of complaint and a trial by a jury of an issue devisavit vel non as to each written instrument having been demanded by the plaintiffs, under Section 11, Article 5, Chapter 41, Code, 1931, the jury by separate verdicts rendered June 12, 1952, found that neither writing was the last will and testament of James M. Ritz.
During the trial, which began May 27, 1952, and ended on June 12, 1952, the circuit court overruled a motion made by the defendants at the conclusion of the evidence introduced by the plaintiffs to direct a verdict for the defendants and a similar motion made by the defendants at the conclusion of all the evidence introduced by the respective parties. The court also refused to give Instruction No. 1, offered by the defendants, which would have directed the jury to return a verdict that the paper writing dated July 10, 1950, and probated January 2, 1951, was the last will and testament of James M. Ritz. At the instance of the defendants and over the objection of the plaintiffs, the court gave an instruction which told the jury that James M. Ritz was mentally competent to make a will when he executed the instrument dated July 10, 1950.
By decree entered October 16, 1952, the circuit court, a special judge sitting in lieu of the regular judge of that court, overruled the motion of the defendants to set aside the verdicts and grant a new trial, held each writing not to be the last will and testament of James M. Ritz, set each of them aside as null and void, and awarded costs in favor of the plaintiffs against the *128 defendants Alva Ritz Kingdon and Charles L. Ritz. From that decree this Court granted this appeal upon the petition of the defendants.
The instrument dated July 10, 1950, signed by James M. Ritz, witnessed by J. E. Wagner, Jr., and James Harold Martin, the lawyer who prepared it, and probated January 2, 1951, by the Clerk of the County Court of Mercer County as the last will and testament of James M. Ritz is in these words:

"Will
"I, James M. Ritz, of Bluefield, Mercer County, State of West Virginia, being of sound mind and disposing memory, do hereby make, declare and publish this, my last will and testament, hereby revoking any other will or wills at any time heretofore made by me, this, my said last will and testament being in manner and form as follows to-wit:
"First: I direct that all my just debts, funeral expenses, and costs of administering my estate, shall be paid out of the corpus of my estate as soon after my death as conveniently possible.
"Second: I hereby bequeath and devise all my property, real, personal and mixed, wherever the same may be situate, as follows, two-thirds (2/3) thereof to my sister, Alva Ritz Kingdon, and one-third (1/3) thereof to my brother, Charles L. Ritz.
"Third: I hereby nominate and appoint the said Alva Ritz Kingdon as Executrix of my estate, and she shall have full power and authority to act on her own personal bond, and no surety shall be required on such bond.
"In witness whereof, I have hereunto set my hand this the 10 day of July, 1950, at Bluefield, West Virginia.
 "James M. Ritz,
 "Testator."
The earlier instrument, dated May 2, 1950, signed by James M. Ritz, witnessed by Stephen D. Narick, the lawyer who drew it, and J. D. H. Sullivan, is couched in this language:
"Last Will and Testament of James M. Ritz
"I, James M. Ritz, of the City of Moundsville, Marshall County, West Virginia, being of sound and disposing mind and memory, declare this to be my Last Will and Testament, and hereby revoke any and all former wills and codicils heretofore made by me.
"First: It is my will that all my just debts, funeral expenses, estate taxes and costs of administration be fully paid out of my estate.
"Second: I give and bequeath the sum of Five Hundred Dollars ($500.00) to J. Harold Snyder of Moundsville, West Virginia.
"Third: All the rest, residue and remainder of my estate, real, personal and mixed, wheresoever located, to which I may be seized or possessed of or entitled to at my death, I give, bequeath and devise an undivided one-third (1/3) unto my brother, Charles L. Ritz, of Williamson, West Virginia and the remaining undivided two-thirds (2/3) unto my sister, Alva Ritz Kingdon, of Bluefield, West Virginia.
"Fourth: I hereby appoint my said sister, Alva Ritz Kingdon, as sole executrix of this my Last Will and Testament and I direct that no surety be required on her bond.
"In witness whereof, I have hereunto set my hand and seal this 2nd day of May, 1950.
 "James M. Ritz (Seal)".
In the course of the trial, which lasted for a period of approximately three weeks, many witnesses testified in behalf of the respective parties and many documentary exhibits were introduced in evidence.
The defendants, as proponents of the instruments dated May 2, 1950, and July 10, 1950, purporting to be wills executed by James M. Ritz, introduced the testimony of a deputy of the Clerk of the County Court of Mercer County who produced and introduced the instrument dated July 10, 1950, and the order entered in the clerk's office *129 on January 2, 1951, probating and recording it as the true last will and testament of James M. Ritz, appointing Alva Ritz Kingdon executrix, and appointing appraisers of his estate; a physician who attended him between May 26 and December 29, 1950, who requested an autopsy after his death which was performed by another doctor, and who testified that James M. Ritz was a person of normal mentality until he was admitted on December 17, 1950, to the hospital in which he died on December 29, 1950; the two attesting witnesses to the instrument dated July 10, 1950; and the two attesting witnesses to the instrument dated May 2, 1950, which was also introduced in evidence. After introducing these two instruments and other written exhibits and the testimony of the foregoing six witnesses the defendants concluded their evidence in chief.
The plaintiffs, as contestants, offered the testimony of twenty-five witnesses, much of which related to the questions of the mental capacity of James M. Ritz and undue influence upon the part of the defendant Alva Ritz Kingdon during the period February 12, 1950, to December 17, 1950, and many written exhibits, among which was included a number of letters written by the defendant Alva Ritz Kingdon to her brother the plaintiff Stuart L. Ritz and her niece the plaintiff Nancy Johnson Sigford and to Harold Snyder and Mrs. Harold Snyder, to impeach the validity of the written instruments signed by James M. Ritz dated May 2, 1950, and July 10, 1950.
In rebuttal the defendants offered the testimony of forty-one witnesses and introduced many additional written exhibits in evidence.
As evidence in surrebuttal the plaintiffs introduced the testimony of three witnesses who had previously testified in their behalf.
The testimony and the exhibits introduced in evidence by the respective parties cover approximately 1600 pages of the printed record and, from this mass of evidence, it is obvious that any narrative other than a general statement of the material facts which bear upon the controlling issues in the case would unduly extend the length of this opinion.
James M. Ritz, an able, experienced and successful lawyer and a man of unusual mental powers and physical energy and vigor, died in a hospital in Bluefield, Mercer County, West Virginia, on December 29, 1950, from an illness which began in December, 1949, and from which he never completely recovered. The cause of his death appears to have been bronchopneumonia in combination with and contributed to by generalized arteriosclerosis. At the time of his death he was seventy nine years of age. He never married and his surviving next of kin and heirs at law were the plaintiff Stuart L. Ritz, a brother, the plaintiff Jean Ritz Marshall, and Elinor Ritz McQuail, daughters of Russell S. Ritz, a deceased brother, the plaintiffs Nancy Johnson Sigford, Katherine Johnson Hurd, Rose Johnson Robinson and Jean Johnson Crouch, daughters of Rose Ritz Johnson, a deceased sister, and the defendants Alva Ritz Kingdon, a sister, and Charles L. Ritz, a brother. Prior to the institution of this suit Elinor Ritz McQuail conveyed any interest claimed by her in the estate to the plaintiff Jean Ritz Marshall and for that reason Elinor Ritz McQuail is not a party to this litigation.
James M. Ritz had lived for about thirty-eight years at a small hotel in Moundsville about twelve miles south of Wheeling where he maintained a law office which adjoined the office of another Wheeling lawyer, Edmund L. Jones, who at times assisted James M. Ritz in certain legal matters. He had little or no social or home life and not many close friends. Except as to articles of personal wearing apparel he was frugal in his standard of living and careful and economical in financial matters. He was independent in his thoughts and ideas and vigorously supported and maintained his views which he was rarely and with difficulty persuaded to modify or alter. He was often characterized as a lawyer's lawyer and during the last few years of his life he retired from general practice and limited his practice to particular matters. He used or employed a stenographer *130 or a secretary only on a part time basis and made use of such services somewhat intermittently. He was honorable, just and fair in all transactions in which he engaged. He made numerous successful investments and his estate, which included real estate and personal property but in which personal property chiefly predominated and which was appraised between January and June, 1951, was of the total appraisement value of $540,412.67. In February, 1950, he told his friend Carl O. Schmidt that his estate would amount to approximately $500,000.00.
In his conversation with friends and acquaintances he made only occasional mention of his relatives and his association with any of them was infrequent and of short duration though such relation as he had with them appear generally to have been friendly and cordial. At intervals during a period of several years before his sickness and death he made contributions in substantial amounts to his sister Alva Ritz Kingdon at whose home some of her nieces, who are plaintiffs in this suit, at times resided. While he stayed at the hotel in Moundsville, which was owned or operated by Fred Snyder, Harold Snyder, his son, and Audrey Snyder, the wife of Harold Snyder, his association with the Snyders was close and friendly. He was treated by them almost as a member of their family and at times he made gifts of suits of clothes to the Snyders and small sums of money to their young children.
In December, 1949, James M. Ritz developed a cold and in February, 1950, he became seriously ill. On Friday, February 10, 1950, a local physician in Moundsville who attended him told him that he would not recover and the Snyders at that time thought he was dying. James M. Ritz himself, however, expressed the opinion that he was not fatally ill. Carl O. Schmidt, a prominent lawyer of Wheeling and a close friend of many years, visited him at the hotel, talked to him about a will, and persuaded him to go to a hospital where he was later examined by his local doctor and a heart specialist at least one of whom then believed that his death was imminent. During a portion of his confinement at the hospital he appeared to be mentally incompetent and some witnesses who visited him there at the time testified to that effect. He quickly made a surprising recovery, however, and left the hospital and returned to the Snyder Hotel on March 6, 1950. Shortly before he entered the hospital and later while he was confined there, Schmidt, who was surprised to learn that he had not made a will, had two or three conversations with him about a will in one of which, according to Schmidt who thought he was then mentally incompetent to make a will, he stated that he wished to leave $50,000.00 to Harold Snyder, $25,000.00 to the Catholic Church, and $25,000.00 to Schmidt, and in another of which, Schmidt refusing to accept any bequest, he told him that he wished to leave $50,000.00 to Snyder and $25,000.00 to the Catholic Church and that the balance should go according to law.
On February 10 or February 11, 1950, the evidence as to the exact date being somewhat conflicting, Harold Snyder and his wife by telephone talked to the defendant Alva Ritz Kingdon, who was then at Bluefield, informed her of the serious condition of her brother and suggested that she come to Moundsville to see him although, according to the Snyders, James M. Ritz had told them that he did not want her to visit him. Whether the telephone conversations between the Snyders and Alva Ritz Kingdon occurred on February 10 or February 11, the evidence is clear that she left Bluefield by bus on the evening of Saturday, February 11, that she arrived in Moundsville in the early morning of February 12, and that upon her arrival she went to the hotel where she saw Harold Snyder who testified that among the first words she spoke to him was an inquiry whether James M. Ritz had made a will which statement she denied in her testimony. A few hours after her arrival at the hotel she went to the hospital to see her brother and from that time until a few days before he died she attended, cared for, entertained, and stayed with him almost constantly during the day and until he retired at night. This general course of conduct *131 on her part occurred while he was in the hospital and after he returned to the hotel on March 6 until he left the hotel with her on May 20, 1950, to go to her home in Bluefield where he resided with her until, because of a terminal illness, he was finally admitted to a hospital on December 17, 1950. While he was at the hotel she slept on a cot in the same room with him.
Shortly prior to or on May 1, 1950, and while James M. Ritz and Alva Ritz Kingdon were staying at the hotel, she went to the law office in Moundsville of Chauncey M. Hinerman, a close friend of James M. Ritz, and told him that her brother wanted him to prepare a will by which she would receive two-thirds and his brother Charles L. Ritz would receive one-third of his estate and in which she should be named as executrix. The next day she returned to his office and informed him that her brother wanted to include a bequest of $500.00 to Harold Snyder. Though Hinerman then entertained doubt as to the competency of James M. Ritz to make a will he prepared a draft and took it to the hotel and presented it to James M. Ritz who was there with Alva Ritz Kingdon. This draft was never signed by James M. Ritz who apparently altered it with certain pencil markings; and a copy which Hinerman produced while he was testifying during the trial, and which despite his denial that he had named himself as co-executor in the draft which he prepared, contained a provision which named him as co-executor.
Later the same day, May 1, 1950, Alva Ritz Kingdon, went to the office of Martin Brown, a Moundsville lawyer who was also a friend of her brother, but, finding that he was ill and absent from his office, she returned to the hotel. She then went to the office of Stephen D. Narick, another lawyer who maintained an office in Moundsville, and told him that her brother wanted to see him. After this conversation Narick went to the hotel and in the absence of Alva Ritz Kingdon talked to James M. Ritz who requested Narick to prepare a will which would give $500 to Harold Snyder, two-thirds of the rest of his estate to her and one-third to his brother, Charles L. Ritz, and would name her as executrix. The conversation between them was not lengthy but Narick made notes of the contents of the proposed will from which, however, he omitted any reference to the matter of surety on the bond to be given by the executrix. Narick's wife was then acting as his stenographer and when he undertook to have her write the draft he discovered this omission, went back to the hotel to inquire of James M. Ritz concerning the bond, and found him standing in front of the hotel. He told Narick that no surety was to be required. After the draft was prepared Narick took it to James M. Ritz at the hotel on the morning of the following day. He read and approved the draft but observed and indicated a mistake in the address of his brother Charles L. Ritz which was erroneously stated to be Williamsburg, instead of Williamson, West Virginia. Narick desired to rectify the error by rewriting that page of the draft, left the hotel for that purpose, caused the correction to be made in that manner, and returned to the hotel with the corrected draft.
James M. Ritz in the prior conversation had inquired of Narick about witnesses to the proposed will and Narick had suggested that he and J. D. H. Sullivan, who was a former mayor of Moundsville and who at the time was engaged in the insurance business with his office in the same building in which Narick's law office was located, act as attesting witnesses. James M. Ritz was well acquainted with Sullivan and approved the suggestion; and after the draft had been corrected as indicated he executed it at the hotel in the presence of Narick and Sullivan as attesting witnesses. At the time it was executed Alva Ritz Kingdon was not present. After it was executed the instrument was left with James M. Ritz. It was dated May 2, 1950, and was introduced in evidence by the defendants upon the trial.
Narick and Sullivan both testified that James M. Ritz freely executed the instrument in their presence; that neither Alva Ritz Kingdon nor any other person was then present; and that at the time he executed it he was mentally competent to make a will. Narick made a written memorandum *132 of the transaction which contained the statement that at the time James M. Ritz appeared to be in good health. That statement was shown to be erroneous and, because of it, the plaintiffs vigorously attack his testimony in its entirety.
Many witnesses testified as to the mental and physical condition of James M. Ritz and the close association of Alva Ritz Kingdon with him during the period March 6, 1950, when he left the hospital and returned to the hotel, and May 20, 1950, when he left for Bluefield. Several witnesses, including Harold Snyder who, after disclaiming and relinquishing by writing dated December 5, 1951, any interest in the estate of James M. Ritz under the instrument dated May 2, 1950, or otherwise, was called as a witness by the plaintiffs, and his wife, who saw and conversed with him frequently, Hinerman and Schmidt, who knew him well and talked to him about his will, and several other persons, who either saw him or saw him and conversed with him casually and infrequently, expressed the opinion that upon those occasions he was noticeably ill physically and was mentally incapable to make a will. Several witnesses also testified that when they saw him Alva Ritz Kingdon was present or if not initially present soon appeared and that he was seldom away from her or out of her presence. Some of these witnesses, however, admitted that at times she made trips from Moundsville to Wheeling unaccompanied by her brother and occasionally left him at the hotel and went alone to different places in Moundsville on errands of varied lengths of time.
On the contrary a number of witnesses, who were well acquainted with James M. Ritz and who saw and talked with him, including Edmund L. Jones, a close friend whose law office adjoined the office in Wheeling which had been occupied by James M. Ritz, the president of a Wheeling bank in which he had an account, his former stenographer, the local physician who treated him, Martin Brown another Moundsville lawyer who had known him for many years, a local minister of the gospel, and Narick and Sullivan, who acted as attesting witnesses to the instrument dated May 2, 1950, testified that though his physical condition was impaired by illness he was, in the opinion of each of them, a person of normal mentality, highly intelligent, and mentally capable of transacting business. Some of these witnesses also testified that they had seen and talked with him when Alva Ritz Kingdon was not present. The evidence also disclosed that while he remained in Moundsville, after leaving the hospital on March 6, 1950, he always recognized his friends and acquaintances and that in the transactions which he carried on with Edmund L. Jones in connection with the settlement of a trust, his account in a Wheeling bank, the closing of his office, and the disposition of its contents, he acted intelligently and that his directions to those with whom he dealt were clear, concise, and effective. Concerning the attitude of James M. Ritz to change his residence from Moundsville to Bluefield the evidence is conflicting. There is testimony that he told some of his acquaintances that he did not wish or intend to go to Bluefield to live; but there is also testimony that he told other acquaintances that he wanted to go there and intended to make his home with his sister.
On May 20, 1950, James M. Ritz left Moundsville with Alva Ritz Kingdon and her son-in-law who at her request came by automobile from his home in Charleston to Moundsville to take them and his personal effects to Bluefield. They spent that night in Charleston at the home of the son-in-law of Alva Ritz Kingdon and on the following day he drove them to her home in Bluefield where from the time of his arrival James M. Ritz resided with her until December 17, 1950, when he entered the hospital in which he died. During the time he resided with her he gave her $1,740.00 and purchased for her an automobile for which he paid $2,168.16 which she drove and in which she took him almost daily on rides in and about Bluefield and on a few trips to Mullens where they visited her sons who were practicing lawyers at that place. There is evidence that while James M. Ritz resided in her home she did not encourage visits to him by some of his nieces or the widow of *133 his deceased brother Russell S. Ritz who resided in Bluefield and although they saw him occasionally their visits to her home for that purpose were not frequent. She testified that they were welcome to visit him at her home; that they were invited by her to do so; and that she devoted her time principally in caring for and attending to him. In a letter written by her to her brother Stuart L. Ritz she stated that she believed that his "feelings were hurt" by their lack of attention to him. While James M. Ritz lived at her home she slept in a room adjoining the room in which he slept and she continued to care for and to attend to him and to associate closely with him. Stuart L. Ritz did not visit James M. Ritz during his illness and did not attend his funeral. Charles L. Ritz who lived in Williamson in this State and his son visited him once at Moundsville and several times while he lived in Bluefield.
On May 22, 1950, the day after his arrival in Bluefield, James M. Ritz went to one of the local banks accompanied by Alva Ritz Kingdon, who was one of its customers. There he met J. E. Wagner, Jr., one of its vice presidents, its cashier, and an employee who subsequently served him in transacting financial matters on several occasions. Between that date and December 6, 1950, the date of his last visit, he came to the bank on an average of twice each month and made additional deposits from time to time to his personal account. He also opened an account for funds of a trust estate with which he was connected and cautioned the employee of the bank to keep separate the deposits in each account. On each visit he was accompanied by his sister but he personally looked after deposits to his account. His deposits were correct and accurate. One transaction in June, 1950, involving certain bonds owned by him was somewhat unusual. The employee who served him was unfamiliar with the method to follow in completing it and James M. Ritz instructed him in detail about the way it should be handled. His directions were followed and the transaction was satisfactorily concluded. The men at the bank with whom he dealt testified that though physically ill he was of normal mentality, accurate and intelligent, and fully capable of transacting business affairs.
In late June or early July, 1950, Alva Ritz Kingdon by telephone called James Harold Martin, a lawyer who had been practicing in Bluefield since August, 1928, and requested him to come to her home to see her brother who desired to consult him about a matter the nature of which she did not disclose. In response to this request Martin later went to her home where she introduced him to James M. Ritz with whom he had not been previously personally acquainted. They engaged in a short general conversation and after she left the room James M. Ritz told Martin that he wanted to make a will and informed him of the provisions he desired to have incorporated in it. He told him that he wanted to be designated in the will as a resident of Bluefield, Mercer County, but he did not mention any earlier will. Martin made notes and later prepared a draft of a will which he took to James M. Ritz and discussed with him, the two being alone at the time. He read the draft to James M. Ritz who approved it and told him that it contained exactly what he wanted. He then mentioned its execution and told him he preferred to execute it at the bank, that he knew Mr. Wagner at the bank where he did his business, and that he wanted him to be a witness. Martin left the draft with James M. Ritz and he next saw the instrument at the bank in connection with its execution on July 10, 1950.
In the meantime, Alva Ritz Kingdon made an appointment with Wagner and Martin to meet James M. Ritz at the bank on July 10, 1950, and on that day she took him to the bank where he met Wagner and the cashier. James M. Ritz made a deposit to his account, Wagner serving him in that transaction, and he, Wagner and the cashier then went to the office of the president which was located in a room adjoining the lobby of the bank about fifteen feet from the lobby. Martin arrived at the bank several minutes later and went to the president's office. The cashier then left the room. James M. Ritz produced the draft *134 which had been prepared by Martin and Martin asked him if he wanted to execute it. He replied that he did and that he wanted Martin and Wagner to witness it. He signed the will in their presence, they signed it as attesting witnesses, and the instrument was then left with James M. Ritz. While James M. Ritz, Martin and Wagner were in the room Alva Ritz Kingdon was in the lobby of the bank. The instrument signed on that occasion is the instrument dated July 10, 1950, which was probated on January 2, 1951, as the will of James M. Ritz.
During the period May 21 to December 17, 1950, many persons who saw and talked with James M. Ritz testified as witnesses concerning his mental capacity and all of them expressed the opinion that he was of normal mentality except Mrs. Russell S. Ritz who, on the occasion of her only visit with him at the home of Alva Ritz Kingdon, believed that he was "rather mentally confused". During that period, by means of letters dictated by him, written by Alva Ritz Kingdon, and signed by him, he engaged in business transactions with Chauncey M. Hinerman, who was at Moundsville, and Edmund L. Jones and Wright Hugus, who were at Wheeling. The transaction between him and Hinerman involved the collection by Hinerman of an indebtedness owing to James M. Ritz and the execution by him at Hinerman's request of a release of the lien of a deed of trust. The transaction between James M. Ritz and Edmund L. Jones related to a trust in the administration of which Jones assisted. The transaction between James M. Ritz and Wright Hugus related to certain indebtedness owed to James M. Ritz by a woman of whose estate Hugus was administrator. The participation by James M. Ritz in each of these transactions was intelligent and contributed to the effective and successful conclusion of all of them. Apparently because of this evidence the circuit court instructed the jury, by Instruction No. 2 offered by the defendants, that James M. Ritz, when he signed the instrument dated July 10, 1950, was competent to make a will.
The physician who treated James M. Ritz during the period May 26, 1950, until his death in December of that year, and who examined him at a hospital on May 27, 1950, in his report of the examination, stated that his impression was that he was afflicted with senility. In testifying on that point he stated that he used that word to describe the advanced age of his patient and that he did not use it to mean enfeeblement of mind or body or to indicate any impairment of his mentality. Two physicians called as witnesses for the plaintiffs, testified, however, that in medical terminology the word meant both mental and physical deterioration in aged persons.
The plaintiffs introduced in evidence several letters written by the defendant Alva Ritz Kingdon to her brother, the plaintiff Stuart L. Ritz, a resident of the State of New York, and her niece, the plaintiff Nancy Johnson Sigford, and also two letters from the plaintiff Stuart L. Ritz to the defendant Alva Ritz Kingdon. Some of these letters were written before and others after the death of James M. Ritz. In letters to Stuart L. Ritz in March and April, 1950, she told him of the illness of James M. Ritz and informed him of his condition. In other letters from Bluefield in May and November, 1950, she also told him of her brother's condition and suggested that he visit him at her home.
Alva Ritz Kingdon did not tell any of the plaintiffs or her niece Elinor Ritz McQuail that James M. Ritz had executed the instruments dated May 2, 1950, and July 10, 1950, or inform them of the contents of either, although she saw Stuart L. Ritz and Mrs. Russell S. Ritz in Florida during a visit there in the month of March, 1951. None of the plaintiffs knew of the instrument dated July 10, 1950, until after it was admitted to probate on January 2, 1951. Stuart L. Ritz appears to have learned of its existence sometime in April, 1951, and on April 26, 1951, from his home in Staten Island, New York, he wrote Alva Ritz Kingdon and told her that he had learned about it after his return from Florida, that there was considerable dissatisfaction upon *135 the part of those who had been excluded, that he had been "contacted by the heirs of Russell and also Rose" who felt that an investigation should be made, and that before consenting to an investigation he wished to inform her of the action proposed to be taken.
In a letter dated April 28, 1951, in reply to his letter dated April 26, 1951, and in a later letter dated May 7, 1951, following another letter from him to her dated May 1, 1951, she accused her nieces, three of the plaintiffs, of improper conduct, made derogatory statements about them, another niece, her deceased brother Russell S. Ritz and his wife, mentioned the care and the assistance which she had formerly given each of her nieces, and complained of their selfishness and lack of appreciation of her treatment of them. She also cautioned him about the institution of litigation to contest the will and intimated that such litigation would involve him in court costs and expenses. She testified that she was hurt and angry when she wrote to him; that she was sorry she had made the critical statements in the letters but that they were substantially true; and that she had never communicated to James M. Ritz the information that she had later written in the letters to Stuart L. Ritz.
There is testimony by some of the plaintiffs, nieces of Alva Ritz Kingdon, that she did not treat them and their sisters fairly during their younger years while they were at times living in her home several years before the death of James M. Ritz. She denied that she had mistreated or neglected any of them during that period and stated that she had treated and cared for them in the same manner in which she had treated and cared for her own two sons and three daughters while they were in her home.
The principal contentions of the defendants upon this appeal are that the evidence shows clearly that at the time James M. Ritz executed the instrument dated May 2, 1950, and the instrument dated July 10, 1950, he was mentally competent to make a will and that the evidence is not sufficient to establish undue influence upon the part of the defendant Alva Ritz Kingdon. On the contrary the plaintiffs insist that, under the evidence, James M. Ritz lacked testamentary capacity when he executed each instrument and the defendant Alva Ritz Kingdon procured the execution of each by the exercise of undue influence; and they vigorously contend that the verdicts of the jury are amply supported by the evidence.
To reverse the decree of October 16, 1952, the defendants assign as error the action of the circuit court: (1) in excusing one juror from the panel of jurors and in excluding from it two jurors upon challenge for cause; (2) in permitting the plaintiffs, over the objections of the defendants, to introduce improper and prejudicial evidence to the jury; (3) in refusing to give Instructions No. 1 and No. 12 requested by the defendants; (4) in permitting the attorneys for the plaintiffs to make improper statements to the jury; (5) in confirming the verdicts rendered by the jury because they are contrary to the law and the evidence and are not supported by the evidence; (6) in refusing to set aside the verdicts of the jury and grant the defendants a new trial; (7) in entering the final decree of October 16, 1952, upon the verdicts of the jury; and (8) in decreeing costs against the defendants Alva Ritz Kingdon and Charles L. Ritz.
The first assignment of error relates to the selection of the jury and the action of the court in excusing one member of the panel and in rejecting two other members of the panel upon challenge for cause. The proceedings had in connection with the selection of the jury, the evidence bearing upon the qualifications of the three members of the panel, and the grounds upon which the court excused one of them and removed the other two upon challenge for cause, are made a part of the record by a special bill of exceptions.
J. C. Mallory, a member of the panel was excused by the court, over the objection of the defendants, because his physical condition was such that a minor operation in a hospital was imminent. Earl Yeager, who was called in place of Mallory, was challenged for cause by the plaintiffs on *136 the ground that he resided near the residence of Alva Ritz Kingdon and that he might entertain some prejudice in the matter. His examination, however, showed that he knew nothing about the matters in controversy except information which he had obtained from reading newspapers and that he had no interest in and had not formed any opinion about the case. He stated that he did not think he was prejudiced but that he thought he would resolve any doubt in favor of Alva Ritz Kingdon. William E. McDougle, another member of the panel, was challenged for cause on the ground that he was acquainted with Alva Ritz Kingdon and was a stockholder and an employee of a company in which one of the attorneys for the defendants was a director. For the reasons indicated Yeager and McDougle were discharged from the panel and qualified jurors were placed upon the panel in lieu of the three members who were excluded from it by the court.
In the selection of a jury in a criminal case or a civil action a trial court is vested with a sound discretion and its action in excusing a qualified juror and in excluding a qualified juror upon challenge for cause will not be disturbed by an appellate court unless it appears that the complaining party was prejudiced by the removal of such jurors from the panel. See State v. McCausland, 82 W.Va. 525, 96 S.E. 938; Eastham v. Holt, 43 W.Va. 599, 27 S.E. 883, 31 S.E. 259. The determination of the qualification of a juror presents a mixed question of law and fact and the findings of a trial court upon such question will not be set aside in the absence of manifest error. State v. McMillion, 104 W.Va. 1, 138 S.E. 732; State v. Larue, 98 W.Va. 677, 128 S.E. 116; State v. Toney, 98 W.Va. 236, 127 S.E. 35, 37. The exclusion of a juror for insufficient cause is not reversible error if the twelve jurors who are finally chosen to try the case are legally qualified. Pardee v. Johnston, 70 W.Va. 347, 74 S.E. 721; Thompson v. Douglass, 35 W.Va. 337, 13 S.E. 1015.
In the Eastham case the opinion contains this language: "It is fair to say that much authority can be found giving a court, even in felon trials, power to discharge jurors. Thomp. & M. Jur. §§ 258, 259. There it is laid down that, as the selection is for the court to secure fit persons, large discretion is given, and that `it by no means follows that, because certain causes have been declared sufficient to justify the trial court in excusing a juror, the sufficiency of excuses in general must be considered a matter of law. On the contrary, it may be considered as the recognized rule that the discharge of a juror under these circumstances is a matter addressed to the sound discretion of the court, which will not be reviewed in the absence of evidence showing prejudice to the complaining party from the abuse of such discretion.' 5 Am. & Eng.Enc.Law, 5."
In the opinion in the Thompson case the material distinction between the selection of a disqualified juror and the exclusion of a juror who is alleged to be disqualified is emphasized and discussed in this quotation from the opinion in Clore's Case, 8 Gratt., Va., 606: "When, upon the commonwealth's challenge, one of the venire is erroneously excluded from the panel, the effect is materially different from that produced by erroneously overruling the prisoner's challenge to a venire man. In the former case the exclusion of a particular man from the jury does not throw any obstacle in the way of impaneling an impartial jury of qualified jurors. The effect is only to set aside one alleged to be disqualified, and put in his place one that is qualified. This exclusion and substitution can in no wise affect the fairness and impartiality of the trial, because the trial is still had before a jury, all the members of which are free from exception. Not so in the other case. Then a disqualified juror is imposed upon the accused. He has not been tried by twelve qualified jurors, as the law entitled him; and the disqualification of the juror thus imposed upon him vitiates the verdict. * * *. But in the other case, notwithstanding the exclusion complained of, of one of the venire, he has had all that any prisoner can be entitled to demanda fair and impartial trial before twelve jurors free from all exception. And again, if the exclusion of the venire man upon the commonwealth's *137 challenge be a matter of exception and ground of error on the part of the accused, how can the supposed wrong that the error has inflicted upon him be repaired? It is only upon the reversal of the judgment to award a new venire facias; not that he may have the excluded venire man impaneled on his jury, but that he may again be tried by twelve qualified jurors; in other words, that he may have another trialsuch precisely, in all respects, as that fair and impartial trial before a jury free from exception that he has already had."
The action of the circuit court in excluding the three jurors from the panel did not constitute an abuse of its discretion and did not prejudicially affect any right of the defendants. The members of the jury selected to try the issue devisavit vel ncn between the parties to this suit were duly qualified and free from exception. As the jury was composed of duly qualified members and as the exclusion of the three members of the panel did not deprive the defendants of their right to a trial by a fair and impartial jury, the action of the court in excluding them from the jury will not be disturbed by this Court upon this appeal.
By their second assignment of error the defendants complain that the circuit court permitted the plaintiffs to introduce improper evidence relating to several matters and to make improper statements to the jury. With respect to the evidence so admitted the ground assigned by the defendants in their motion to set aside the verdict and grant a new trial was general in character and did not specify the evidence of which they complain and such evidence, though made a part of the record by a general bill of exceptions which contained all the evidence, was not incorporated in any special bill of exceptions. The only specific reference to the evidence admitted by the circuit court of which they complain is that contained in the briefs filed by them in this Court upon this appeal. This Court has held in many cases that alleged errors in the admission or the rejection of evidence are waived if such errors are not made the ground of a motion to set aside the verdict and grant a new trial or are not incorporated in special bills of exceptions which show the evidence and the ruling of the court, even though all the evidence is made a part of the record by a general bill of exceptions. State v. Cruikshank, W.Va., 76 S.E.2d 744; Isabella v. West Virginia Transportation Company, 132 W.Va. 85, 51 S.E.2d 318; Haldren v. Berryman, 109 W.Va. 403, 155 S.E. 125; Graner v. Boring, 105 W.Va. 505, 143 S.E. 232; Stewart v. Pollack-Forsch Company, 105 W.Va. 453, 143 S.E. 98; Tuggle v. Belcher, 104 W.Va. 178, 139 S.E. 653; Draper v. Mercer Hardware & Furniture Company, 104 W.Va. 144, 139 S.E. 645; State v. Henderson, 103 W.Va. 361, 137 S.E. 749; State v. Male, 103 W.Va. 355, 137 S.E. 751; State v. John, 103 W.Va. 148, 136 S.E. 842; Roberts v. Lykins, 102 W.Va. 409, 135 S.E. 388; Dransfield v. Boone-Armstrong Motor Company, 102 W.Va. 370, 135 S.E. 286; Tredway v. New River & Pocahontas Consolidated Coal Company, 102 W.Va. 135, 135 S.E. 253; Proudfoot v. Pocahontas Transportation Company, 100 W.Va. 733, 132 S.E. 746; Trippett v. Monongahela West Penn Public Service Company, 100 W.Va. 319, 130 S.E. 483; State v. Noble, 96 W.Va. 432, 123 S.E. 237; Moorefield v. Lewis, 96 W.Va. 112, 123 S.E. 564; Guyandotte Coal Company v. Virginian Electric & Machine Works, 94 W.Va. 300, 118 S.E. 512; State v. Jones, 77 W.Va. 635, 88 S.E. 45; Bartlett v. Bank of Mannington, 77 W.Va. 329, 87 S.E. 444; Angrist v. Burk, 77 W.Va. 192, 87 S.E. 74; Hill v. Norton, 74 W.Va. 428, 82 S.E. 363, Ann.Cas.1917D, 489; Ireland v. Smith, 73 W.Va. 755, 81 S.E. 542; State v. Henaghan, 73 W.Va. 706, 81 S.E. 539; State v. Bingham, 42 W.Va. 234, 24 S.E. 883; Halstead v. Horton, 38 W.Va. 727, 18 S.E. 953; Gregory's Adm'r v. Ohio River Railroad Company, 37 W.Va. 606, 16 S.E. 819.
In Haldren v. Berryman, 109 W.Va. 403, 155 S.E. 125, this Court held in point 1 of the syllabus, that objections to evidence, unless made the subject of special bills *138 of exceptions or specifically presented to the trial court as grounds of a motion to set aside the verdict and grant a new trial, will not be considered on writ of error to this Court. See also Trippett v. Monongahela West Penn Public Service Company, 100 W.Va. 319, 130 S.E. 483. In State v. Henderson, 103 W.Va. 361, 137 S.E. 749, the syllabus is in these words: "As this court has often held, alleged errors in the admission or rejection of evidence are waived, if not made the ground of a motion to set aside the verdict, or incorporated in special bill or bills of exception showing the evidence and the ruling of the court thereon." This syllabus was approved and applied in point 1 of the syllabus in State v. Male, 103 W.Va. 355, 137 S.E. 751, and in the opinion this Court said: "* * * the admission and rejection of evidence is waived because the same has not been made a special ground for setting aside the verdict, or incorporated in special bills of exceptions showing the evidence and the rulings of the court thereon. A general reference to errors in the introduction of evidence as a ground for setting aside the verdict will not suffice. The court's attention must be specifically called to the errors on such motion, or they must be carried into the record by proper bills of exception." Under those two cases and the other above cited cases, alleged errors in the admission or the rejection of evidence, to which objection has been made in the trial court, are waived unless such evidence is specifically set forth as a ground of a motion to set aside the verdict and grant a new trial or unless it is incorporated in a special bill of exceptions which shows the evidence and the ruling of the court in admitting or rejecting it. The evidence now complained of not having been specified in the motion to set aside the verdict and grant a new trial, or incorporated in a special bill of exceptions, any error in admitting it must be deemed to have been waived and such error, if any there be, will not be considered or reviewed upon this appeal.
It is here pointed out that the holding and certain statements in the opinions of this Court in several prior cases on this point are inconsistent with its present holding as just stated and its holding in the above cited cases. See article "The Transcript of the Evidence as a Substitute for Special Bills of Exceptions" by Professor Leo Carlin, College of Law, West Virginia University, June, 1926, 32 West Virginia Law Quarterly 321. The prior cases above referred to are Hinton Milling Company v. New River Milling Company, 78 W.Va. 314, 88 S.E. 1079; Bond v. National Fire Insurance Company, 77 W.Va. 736, 88 S.E. 389; Walters v. Appalachian Power Company, 75 W.Va. 676, 84 S.E. 617; Parr v. Howell, 74 W.Va. 413, 82 S.E. 126; Wright v. Ridgely, 67 W.Va. 319, 67 S.E. 787; Fuller v. Margaret Mining Company, 64 W.Va. 437, 63 S.E. 206; McClanahan v. Caul, 63 W.Va. 418, 60 S.E. 382; Williams & Davisson Company v. Ferguson Contracting Company, 60 W.Va. 428, 55 S.E. 1011; Foley v. City of Huntington, 51 W.Va. 396, 41 S.E. 113; Bodkin v. Arnold, 48 W.Va. 108, 35 S.E. 980; Kay v. Glade Creek & Raleigh Railroad Company, 47 W.Va. 467, 35 S.E. 973; and McDodrill v. Pardee & Curtin Lumber Company, 40 W.Va. 564, 21 S.E. 878. To the extent that the holding in the cases just cited and statements in the opinions in those cases are inconsistent or in conflict with the holding in this case on this point, such holding is overruled and such statements are disapproved. This action is now taken by this Court for the purpose of making clear and certain the procedure required for the consideration by this Court of alleged errors committed by a trial court in the admission or the rejection of evidence in cases in which the parties are entitled to a trial by a jury.
The defendants contend that the circuit court erred in permitting counsel for the plaintiffs to make certain statements to the jury during the argument of the case. These statements and the proceedings had in relation to them are made a part of the record by a special bill of exceptions. One of the statements related to the action of counsel for the defendants in causing the court reporter to record the argument of counsel for the plaintiffs and in not requiring *139 the reporter to record the argument of counsel for the defendants. In a discussion of that subject between counsel during the argument to the jury by an attorney for the plaintiffs one of his associates made these statements: "Why is it these gentlemen want the argument reported? Why didn't they have their own argument reported, too? Why report part of the arguments?" Counsel for the defendants objected and the court, without expressly ruling upon the objection, in effect overruled it and directed counsel to proceed with his argument. Later in his argument the same attorney made this statement: "Gentlemen of the jury, a lawyer knows when he makes a new will that he is supposed to destroy the old one by obliterating, tearing or burning the old one up. How do you think the two of them happened to be in his lock box? Do you think he knew that? Do you think a good lawyer would do that? Why didn't he tear the old one up of May 2nd?" Counsel for the defendant then said: "Your Honor, we think that is not a correct statement of the law as to how a will may be cancelled." To this remark counsel for the plaintiffs made this reply: "I will let you tell them and they can accept your version." Counsel for the defendants interposed an objection which, in the absence of an express ruling, the court in effect overruled. Counsel for the defendants did not request an express ruling upon either objection, or note an exception, or move the court to strike the statements, or to instruct the jury to disregard them, or because of them to declare a mistrial. It does not appear that either statement was prejudicial to any right of the defendants. If, however, either statement may be regarded as prejudicial, the defendants, in failing to except, or to move the court to strike the statements, or to instruct the jury to disregard them, or because of them to declare a mistrial, waived the effect of any prejudice which resulted from such statements or either of them. Tennessee Gas Transmission Company v. Fox, 134 W.Va. 106, 58 S.E.2d 584; State v. Lewis, 133 W.Va. 584, 57 S.E.2d 513; Gilkerson v. Baltimore & Ohio Railway Company, 132 W.Va. 133, 51 S.E.2d 767; Yuncke v. Welker, 128 W.Va. 299, 36 S.E.2d 410; Reynolds v. Griffith, 126 W.Va. 766 30 S.E.2d 81; State v. Files, 125 W.Va. 243, 24 S.E.2d 233; State v. Fisher, 123 W.Va. 745, 18 S.E.2d 649; Deitz v. County Court of Nicholas County, 122 W.Va. 296, 8 S.E.2d 884; Given v. Diamond Shoe & Garment Company, 84 W.Va. 631, 101 S.E. 153. "Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Point 6, syllabus, Yuncke v. Welker, 128 W.Va. 299, 36 S.E.2d 410.
The assignments of error relating to the action of the circuit court in refusing to give Instruction No. 1, requested by the defendants, which would have directed the jury to ascertain and find that the instrument dated July 10, 1950, probated January 2, 1951, is, in its entirety and as to every part, the last will and testament of James M. Ritz, in confirming the verdicts of the jury, in refusing to set aside such verdicts and to grant a new trial, and in entering the final decree based on such verdicts, present the controlling questions whether the evidence establishes the mental capacity of James M. Ritz to make a will when he executed the instruments dated May 2, 1950, and July 10, 1950, and undue influence by the defendant Alva Ritz Kingdon in procuring their execution by him.
Upon an issue devisavit vel non, under Section 11, Article 5, Chapter 41, Code, 1931, as distinguished from an issue out of chancery, the verdict of a jury is not merely advisory but has all the characteristics of a verdict rendered in an action at law; and, if the verdict of the jury is sustained by the evidence and no error of law occurs upon the trial, such verdict is binding upon the trial chancellor. Prichard v. Prichard, 135 W.Va. 767, 65 S.E.2d 65; Grottendick v. Webber, 134 W.Va. 798, 61 S.E.2d 854; Powell v. Sayres, 134 W.Va. 653, 60 S.E.2d 740; Snedeker v. Rulong, 69 W.Va. 223, 71 S.E. 180; Dower v. Seeds, 28 W.Va. 113; Dower v. Church, 21 W.Va. 23. The validity of the verdict of the jury *140 upon that issue should be tested and determined by the same principles which apply to the verdict of a jury in an action at law.
Upon the trial of an issue devisavit vel non in a suit to impeach a will the burden of proving the testamentary capacity of the testator at the time of the execution of the will is upon the proponent of the will. Powell v. Sayres, 134 W.Va. 653, 60 S.E.2d 740; Payne v. Payne, 97 W.Va. 627, 125 S.E. 818; Kerr v. Lunsford, 31 W.Va. 659, 8 S.E. 493, 2 L.R.A. 668; Nicholas v. Kershner, 20 W.Va. 251; McMechen v. McMechen, 17 W.Va. 683. The time to be considered in determining the capacity of the testator to make a will is the time at which the will was executed. Prichard v. Prichard, 135 W.Va. 767, 65 S.E.2d 65; Moore v. Moore, 120 W.Va. 468, 199 S.E. 257; Pickens v. Wisman, 106 W.Va. 183, 145 S.E. 177; Payne v. Payne, 97 W.Va. 627, 125 S.E. 818; Stewart v. Lyons, 54 W.Va. 665, 47 S.E. 442; Martin v. Thayer, 37 W.Va. 38, 16 S.E. 489; Kerr v. Lunsford, 31 W.Va. 659, 8 S.E. 493, 2 L.R.A. 668; Nicholas v. Kershner, 20 W.Va. 251; Tate v. Chumbley, 190 Va. 480, 57 S.E.2d 151; Jenkins v. Trice, 152 Va. 411, 147 S.E. 251; Forehand v. Sawyer, 147 Va. 105, 136 S.E. 683. Old age and eccentricity incident to it are not of themselves sufficient to establish lack of mental capacity of a testator to make a will, Prichard v. Prichard, 135 W.Va. 767, 65 S.E.2d 65; Kerr v. Lunsford, 31 W.Va. 659, 8 S.E. 493, 2 L.R.A. 668; Nicholas v. Kershner, 20 W.Va. 251; and it requires less capacity to make a will than to make a deed, Kerr v. Lunsford, 31 W.Va. 659, 8 S.E. 493, 2 L.R.A. 668; Nicholas v. Kershner, 20 W.Va. 251. Mere infirmity of mind and body due to illness is not alone sufficient to establish mental incapacity of a testator to make a will. Payne v. Payne, 97 W.Va. 627, 125 S.E. 818; Wooddy v. Taylor, 114 Va. 737, 77 S.E. 498. The execution by a testator of an unnatural will is a fact relevant to the issue of his testamentary capacity but that fact alone is not sufficient to establish lack of testamentary capacity. Forehand v. Sawyer, 147 Va. 105, 136 S.E. 683. "It is not necessary that a person should possess the highest qualities of mind in order to make a will nor that he should have the same strength of mind which he may formerly have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, the character may be eccentric, and he may even want capacity to transact many of the ordinary business affairs of life; but it is sufficient, if he understand the nature of the business in which he is engaged, has a recollection of the property which he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them." Point 2, syllabus, Nicholas v. Kershner, 20 W.Va. 251. Upon the issue of the mental capacity of a testator to make a will, the testimony of the attesting witnesses, the draftsman, and attending physicians is entitled to great weight. Prichard v. Prichard, 135 W.Va. 767, 65 S.E.2d 65; Freeman v. Freeman, 71 W.Va. 303, 76 S.E. 657; Stewart v. Lyons, 54 W.Va. 665, 47 S.E. 442; Martin v. Thayer, 37 W.Va. 38, 16 S.E. 489; Kerr v. Lunsford, 31 W.Va. 659, 8 S.E. 493, 2 L.R.A. 668; Hall v. Hall, 181 Va. 67, 23 S.E.2d 810; Culpepper v. Robie, 155 Va. 64, 154 S.E. 687; Forehand v. Sawyer, 147 Va. 105, 136 S.E. 683; Thornton v. Thornton's Ex'rs, 141 Va. 232, 126 S.E. 69.
Though the testimony shows that during the period December, 1949, when he contracted a cold, to December 17, 1950, when he entered the hospital in which he died on December 29, 1950, James M. Ritz was ill and suffering from bodily infirmities and physical ailments which varied in intensity from time to time, and though there is some conflict in the testimony of the witnesses on the question of his testamentary capacity while he was in Moundsville from February, 1950, until he left for Bluefield on May 20, 1950, his mental capacity to make a will at the time he executed the instrument dated May 2, 1950, at Moundsville, and the instrument dated July 10, 1950, at Bluefield is definitely and distinctly established by the clear preponderance of the evidence.
The evidence shows that between March 6, 1950, when he left a hospital in Moundsville, and December 17, 1950, when he finally *141 entered a hospital in Bluefield, he transacted and engaged in the transaction of numerous important business, financial and legal matters the occurrence of which is undisputed; that those transactions could have been performed or accomplished only by a person of normal mental capacity; and that his acts and conduct in connection with all of them were intelligent, concise and effective. No witness testified that, at any time or upon any occasion during that period, he failed to recognize or remember any friends or acquaintances whom he met or with whom he associated. The unequivocal testimony of Narick, the draftsman of the instrument dated May 2, 1950, and one of the attesting witnesses, and of Sullivan, the other attesting witness, who were the only persons present with James M. Ritz when he executed it, is that at that time he was mentally competent to make a will. The physician who treated him during his illness in Moundsville also testified that he detected no impairment of his mentality and that he considered him to be a mentally normal person. The testimony of these witnesses on that point is not controverted as to the particular times and occasions to which it relates and, for that reason and because of the capacity in which each of them acted, their testimony is entitled to great weight.
That James M. Ritz was mentally competent to make a will at the time he executed the instrument dated July 10, 1950, is also clearly established by the evidence. The undisputed evidence is that he made in the ordinary and accepted manner a deposit to his account at the bank shortly before he executed that instrument, and the positive testimony of Martin, who prepared it after discussing it with him and who acted as one of the attesting witnesses, and of Wagner, who acted as the other attesting witness, is that he was fully competent to make a will at the time he signed it in their presence and that he and they were the only persons who were then present. The testimony of the physician who treated and attended him while he was in Bluefield is that, during that time, and despite his illness, he was a person of normal mentality. The trial court, at the instance of the defendants, instructed the jury that at the time he executed the instrument dated July 10, 1950, he was competent to make a valid will and, although counsel for the plaintiffs objected to the instruction and do not concede that he was mentally competent at that time, they have not, by cross assignment of error in this Court, challenged the correctness of the action of the trial court in so instructing the jury.
The contention of the plaintiffs that the disposition of the property of James M. Ritz by the instrument dated July 10, 1950, is unnatural and that the instrument of that date is of that character is not supported by the facts. Though it makes a different disposition of his property from that which Schmidt and Hinerman testified he told them he intended to make and differs from the instrument dated May 2, 1950, in that it omits any bequest to Harold Snyder, it gives his property to a sister and a brother and excludes a brother and six nieces with whom he had had no close or frequent association during his illness in the last year of his life. It does not distribute his property among strangers or give it to persons who are not among his next of kin. As his mental capacity to make a will at the time he executed the instrument dated July 10, 1950, is clearly established he had the right freely to dispose of his property in any way he wished to dispose of it regardless of the opinions of other persons who may have believed that his disposition of his property was unequal, inequitable, unjust, or unreasonable. Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831; Stewart v. Lyons, 54 W.Va. 665, 47 S.E. 442; Martin v. Thayer, 37 W. Va. 38, 16 S.E. 489; Coffman v. Hedrick, 32 W.Va. 119, 9 S.E. 65; Couch v. Eastham, 29 W.Va. 784, 3 S.E. 23; Nicholas v. Kershner, 20 W.Va. 251. In Couch v. Eastham, 29 W.Va. 784, 3 S.E. 23, the opinion contains this language: "When a testator has the legal capacity to make a will, he has the legal right to make an unequal, unjust or unreasonable will. * * *. The courts may construe and enforce a will, but they can neither make nor change one. That is the province of the testator alone." Point *142 3 of the syllabus in Nicholas v. Kershner, 20 W.Va. 251, is in these words: "Where legal capacity is shown, and the testator acts freely, the validity of the will cannot be impeached, however unreasonable, imprudent, or unaccountable it may seem to the jury or to others." In Forehand v. Sawyer, 147 Va. 105, 136 S.E. 683, in discussing a will which was regarded as unnatural, the court said: "When once the capacity of the testator has been established, his will must stand as the reason for his action. Be he wise or unwise, he is the disposer of his own property. * * *. A testator is under no legal obligation to will his property to his wife or to any other person, and the justice or propriety of his will is not a question for the consideration of the jury except as a circumstance bearing on his mental capacity. If he was mentally competent, he had the right to dispose of his property as he chose, regardless of the opinion of others. Huff v. Welch, 115 Va. 74, 78 S.E. 573."
The second ground upon which the plaintiffs assail the validity of the instruments dated May 2, 1950, and July 10, 1950, is undue influence alleged to have been exerted upon James M. Ritz by the defendant Alva Ritz Kingdon during the period of her close association with him in 1950. In a suit to impeach a will the burden of proving undue influence is upon the party who alleges the exercise of such influence. Mullens v. Lilly, 123 W.Va. 182, 13 S.E.2d 634; Payne v. Payne, 97 W.Va. 627, 125 S.E. 818; Bade v. Feay, 63 W.Va. 166, 61 S.E. 348; Stewart v. Lyons, 54 W.Va. 665, 47 S.E. 442; McMechen v. McMechen, 17 W.Va. 683. Undue influence, to invalidate a will, must be such influence as destroys the free agency of the testator and, in legal effect, amounts to force and coercion. Mullens v. Lilly, 123 W.Va. 182, 13 S.E.2d 634; Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831; Snodgrass v. Weaver, 120 W.Va. 444, 199 S.E. 1; Payne v. Payne, 97 W.Va. 627, 125 S.E. 818; Doak, Adm'r v. Smith, 93 W.Va. 133, 116 S.E. 691; Snedeker v. Rulong, 69 W.Va. 223, 71 S.E. 180; Woodville v. Woodville, 63 W.Va. 286, 60 S.E. 140; Bade v. Feay, 63 W.Va. 166, 69 S.E. 348; Stewart v. Lyons, 54 W.Va. 665, 47 S.E. 442; Erwin v. Hedrick, 52 W.Va. 537, 44 S.E. 165; Farnsworth v. Noffsinger, 46 W.Va. 410, 33 S.E. 246; Delaplain v. Grubb, 44 W.Va. 612, 30 S.E. 201, 67 Am.St.Rep. 788; Coffman v. Hedrick, 32 W.Va. 119, 9 S.E. 65; Forney v. Ferrell, 4 W.Va. 729; Dearing v. Dearing, 132 Va. 178, 111 S.E. 286; Wooddy v. Taylor, 114 Va. 737, 77 S.E. 498; Howard v. Howard, 112 Va. 566, 72 S.E. 133. Force and coercion necessary to invalidate a will, however, need not be physical or applied at any particular time. Mullens v. Lilly, 123 W.Va. 182, 13 S.E.2d 634; Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831; Snodgrass v. Weaver, 120 W.Va. 444, 199 S.E. 1. Undue influence which will invalidate a will is never presumed but must be established by proof which, however, may be either direct or circumstantial. Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831; Freeman v. Freeman, 71 W.Va. 303, 76 S.E. 657; Black v. Post, 67 W.Va. 253, 67 S.E. 1072; Woodville v. Woodville, 63 W.Va. 286, 60 S.E. 140; Delaplain v. Grubb, 44 W.Va. 612, 30 S.E. 201, 67 Am.St.Rep. 788; Coffman v. Hedrick, 32 W.Va. 119, 9 S.E. 65.
Proof of opportunity for, or possibility or suspicion of, the exercise of undue influence is not alone sufficient to establish undue influence. Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831. Influence which arises from acts of kindness and attention to the testator, from attachment or love, from persuasion or entreaty, or from the mere desire to gratify the wishes of another, if free agency is not impaired, does not constitute, and is not alone sufficient to establish, undue influence. Ebert v. Ebert,. 120 W.Va. 722, 200 S.E. 831; Payne v. Payne, 97 W.Va. 627, 125 S.E. 818; Doak, Adm'r v. Smith, 93 W.Va. 133, 116 S.E. 691; Snedeker v. Rulong, 69 W.Va. 223, 71 S.E. 180; Stewart v. Lyons, 54 W.Va. 665, 47 S.E. 442; Kerr v. Lunsford, 31 W.Va. 659, 8 S.E. 493, 2 L.R.A. 668; Hale v. Cole, 31 W.Va. 576, 8 S.E. 516; Nicholas v. Kershner, 20 W.Va. 251. In the Nicholas case, in point 6 of the syllabus, this Court said: "Although the testator was fickle and inconstant and at one time favored one or more of his children, and at *143 other times disliked them and favored others, still if he acted freely and had the capacity to understand the nature of the business in which he was engaged, and a recollection of the property which he meant to dispose of, the objects of his bounty and the manner in which he wished to divide it, the will is not invalid on that account; and if his will was caused by the extreme kindness and attention of the principal devisees, that will not constitute undue influence, which will invalidate the will." In the Kerr case point 22 of the syllabus is in these words: "If the provisions of the will were induced by the extreme kindness and attention to the testator on the part of the principal devisees, that will not constitute undue influence, which will invalidate the will."
The evidence upon which the plaintiffs rely to show undue influence upon the part of the defendant Alva Ritz Kingdon does not establish the exercise of undue influence by her at any time. There is no direct evidence of any conduct upon her part at any time or place which amounts to or constitutes undue influence. The absence of proof of that nature is conceded by counsel for the plaintiffs who, however, earnestly insist that the evidence, though circumstantial, is sufficient to warrant the inference from it by the jury that the execution of each instrument by James M. Ritz was procured by the exercise of undue influence by Alva Ritz Kingdon, and that each verdict as to the issue of undue influence is amply supported by the evidence.
In support of this position they specifically mention and emphasize the facts and the circumstances that James M. Ritz was physically weak because of his illness; that the defendant Alva Ritz Kingdon had the intelligence, the ability, the allegedly mercenary motive, and the opportunity, during the period of her close and almost exclusive association with him in caring for and attending to him, to exercise undue influence; that she was active in connection with the execution of each instrument; that she did not inform the plaintiffs of the existence or the contents of either instrument; that she entertained dislike for the plaintiffs and the Snyders; that she made derogatory statements concerning some of the plaintiffs in her letters to Stuart L. Ritz written after the death of James M. Ritz; that she endeavored to dissuade Stuart L. Ritz from encouraging or instituting a will contest; that she undertook to prepare a defense to this suit prior to its institution; and that there is no explanation of the change by James M. Ritz of his intention to dispose of his property as provided by each instrument from his previously expressed intention to make a different distribution of his estate.
Careful analysis and full consideration of the evidence in its entirety, however, indicate clearly that, at most, the evidence, concerning the above enumerated facts and circumstances and other related matters, establishes merely the opportunity for, or the possibility or the suspicion of, the exercise of undue influence by her. As already pointed out, opportunity for, or possibility or suspicion of, the exercise of undue influence does not constitute or sufficiently prove the exercise of undue influence. The evidence does not show that the substance of the derogatory statements in the letters written by her to the plaintiff Stuart L. Ritz in any way influenced James M. Ritz in disposing of his property as provided in either instrument or that the contents of those statements were ever communicated to him by her. The only direct evidence on that point is her testimony that she did not impart that information to him in his lifetime.
As previously indicated the attesting witnesses to each instrument, who with James M. Ritz were the only persons present when he executed each of them, testified that he freely and voluntarily executed such instruments and the testimony of these attesting witnesses with respect to what occurred on each occasion is not disputed. To set aside a will of a person of sound mind, on the ground of undue influence, the proof must show that the circumstances surrounding its execution were consistent with the exercise of undue influence and inconsistent with its absence; and the exercise of such influence in connection *144 with the will can not be presumed but must be established by proof. Coffman v. Hedrick, 32 W.Va. 119, 9 S.E. 65. Proof of undue influence which will invalidate a will must be consistent with the exercise of such influence and inconsistent with the absence of such influence. Dearing v. Dearing, 132 Va. 178, 111 S.E. 286; 57 Am.Jur., Wills, Section 435. To warrant a finding of undue influence which is based on circumstantial evidence the established facts must be inconsistent with any theory other than that of undue influence. 2 Page on Wills, Lifetime Edition, Chapter 21, Section 815. The evidence bearing upon the question of the exercise of undue influence by Alva Ritz Kingdon in procuring the execution of each instrument by James M. Ritz amounts to mere speculation or conjecture that, at some unmentioned time and place and by some unknown means or method, she accomplished that result. Mere suspicion, conjecture, possibility or guess that undue influence has been exercised is not sufficient to support a verdict which impeaches a will on the ground of undue influence. 57 Am.Jur., Wills, Section 435. The verdicts of the jury upon the issue of the exercise of undue influence by Alva Ritz Kindon, being without sufficient evidence to support them and being based upon conjecture and speculation, can not stand. "A jury will not be permitted to base its findings of fact upon conjecture or speculation." Point 1, syllabus, Oates v. Continental Insurance Company, 137 W.Va. , 72 S.E.2d 886.
The defendants complain of the refusal of the trial court to give Instruction No. 1 offered by them, which would have directed the jury to find that the instrument dated July 10, 1950, and probated January 2, 1951, is the last will and testament of James M. Ritz. In the trial of an issue devisavit vel non the pleadings and the mode of procedure are substantially the same as in the trial of an action at law and the trial court has the right to entertain and pass upon a motion by any party in such manner as may be warranted by the record. Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831; Meade v. Meade, 111 Va. 451, 69 S.E. 330; 20 Michie's Jurisprudence, Wills, Section 70. When on motion by a party for a directed verdict in the trial of an issue devisavit vel non in a suit to impeach a will it appears that the court, upon the evidence presented, would be required to set aside a verdict in favor of the opposite party, the motion to direct a verdict should be sustained. Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831. As upon the evidence presented by the record the verdicts in favor of the plaintiffs, being contrary to the plain preponderance of the evidence upon the issue of testamentary capacity and unsupported by the evidence upon the issue of undue influence, can not stand, the trial court should have directed the verdict set forth in the instruction, and its refusal to give the instruction constituted reversible error.
Instruction No. 12, offered by the defendants and refused by the court, would have told the jury that a person who is incompetent or mentally diseased may not bring an action in the name of such person and that, as Jean Johnson Crouch had joined in the suit as plaintiff in her own name, it could not be contended by the plaintiffs that she is incompetent or mentally diseased. As there is no evidence that the plaintiff Jean Johnson Crouch is incompetent the instruction is not based upon the evidence as to that fact. The instruction also incorrectly propounds the law and would tend to mislead the jury. For these reasons it was properly refused.
Upon a trial by a jury of an issue devisavit vel non the court may, when proper, as in an action at law, direct or set aside a verdict. Prichard v. Prichard, 135 W.Va. 767, 65 S.E.2d 65; Ebert v. Ebert, 120 W.Va. 722, 200 S.E. 831. A verdict which is without evidence to support it or is against the clear preponderance of conflicting evidence will, on proper motion, be set aside by the court. Kap-Tex, Inc. v. Romans, 136 W.Va. 489, 67 S.E.2d 847; Cannady v. Chestonia, 106 W.Va. 254, 145 S.E. 390; Palmer v. Magers, 85 W.Va. 415, 102 S.E. 100; Griffith v. American Coal Company, 78 W.Va. 34, 88 S.E. 595; Kelley v. Æ Insurance Company, 75 W.Va. *145 637, 84 S.E. 502; Sims v. Carpenter, Frazier & Company, 68 W.Va. 223, 69 S.E. 794; Coalmer v. Barrett, 61 W.Va. 237, 56 S.E. 385; Chapman v. Liverpool Salt & Coal Company, 57 W.Va. 395, 50 S.E. 601. A verdict of a jury upon an issue devisavit vel non which is not sustained by evidence will be set aside and a new trial awarded. Powell v. Sayres, 134 W.Va. 653, 60 S.E.2d 740. "Where the verdict of a jury is wholly without evidence on a point essential to a finding, or the evidence is plainly insufficient to warrant such finding by the jury, the same will be set aside and a new trial awarded." Point 2, syllabus, Closterman v. Lubin, 113 W.Va. 353, 167 S.E. 871. The verdicts of the jury in this case, being against the clear preponderance of the evidence on the issue of the mental capacity of James M. Ritz to make a will and without evidence to support them on the issue of the exercise of undue influence by Alva Ritz Kingdon, should have been set aside, and the refusal of the circuit court to grant the motion of the defendants to set aside the verdicts and to grant a new trial constituted reversible error.
The defendants complain of the action of the circuit court in decreeing costs in favor of the plaintiffs and against the defendants Alva Ritz Kingdon and Charles L. Ritz instead of against Alva Ritz Kingdon in her representative capacity as executrix of James M. Ritz. As the final decree of October 16, 1952, must be reversed, the action of the court in decreeing such costs will not be discussed or considered on this appeal.
The final decree of the Circuit Court of Mercer County is reversed, the verdicts of the jury are set aside, a new trial is awarded the defendants, and this case is remanded to that court for such proceedings, in conformity to the principles enunciated in this opinion, as may be necessary and proper.
Decree reversed; verdicts set aside; new trial awarded; case remanded.
RILEY, J., did not participate in the consideration or decision of this case.